**DISABLED AMERICAN VETERANS**

v.

**The UNITED STATES.**

**No. 360–76.**

United States Court of Claims.

May 20, 1981.

Bart A. Brown, Jr., Cincinnati, Ohio, attorney of record, for plaintiff. Brown & Gardner Co., L.P.A., Cincinnati, Ohio, of counsel.

William C. Rapp, Washington, D. C., with whom was Acting Asst. Atty. Gen. John F. Murray, Washington, D. C., for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before SKELTON, Senior Judge, and KASHIWA and BENNETT, Judges.

## OPINION

PER CURIAM:

This case is before the court on review of the report of Trial Judge James F. Merow. Because we disagree with that portion of the report dealing with whether a satisfactory refund claim was filed relating to a deduction for the cost of the names list, we reverse the trial judge on that point. We are in agreement with the remainder of the report and, accordingly, we adopt the modified report as an opinion of this court.[1]

Regarding the above-discussed variance issue, the trial judge found that the informal oral knowledge gained by the Internal Revenue Service' agents during the audit of plaintiff's (DAV's) returns plus the submission of the pretrial response during the pendency of this case provided "express knowledge" to the Internal Revenue Service of DAV's claim for a deduction for the cost of the names list.

We, however, reject out of hand the notion expressed by the trial judge that the information garnered by the Justice Department's trial attorney from DAV's pretrial submission constituted knowledge chargeable to the Internal Revenue Service for purposes of section 7422(a). Such a position is in fundamental conflict with the clearly established and well-defined procedure found in the Internal Revenue Code and the Treasury Regulations. *See, e. g.,* section 6402; section 7422(a); Treas.Reg.

§ 301.6402-2. Furthermore, it is abundantly clear that our cases focus not on whether the "Government" or, as DAV avers, the "defendant" has knowledge of the claim but, specifically, on whether the *Internal Revenue Service* has such notice. *E. g., Union Pacific R. R. v. United States,* 182 Ct.Cl. 103, 113, 389 F.2d 437, 444 (1968); *Nat'l Newark & Essex Bank v. United States,* 187 Ct.Cl. 609, 615, 410 F.2d 789, 792 (1969); *Standard Lime and Cement Co. v. United States,* 165 Ct.Cl. 180, 187, 329 F.2d 939, 943 (1964).

■ Filing a petition is not a satisfactory claim for refund, *see* section 7422(a); *Union Pacific,* 182 Ct.Cl. at 109, 389 F.2d at 442; thus, *a priori,* filing a pretrial submission does not constitute notice to the Service for purposes of section 7422(a). We have said that "[a]vailability of information is not equivalent to notice that a claim is asserted based on that information. That claim must somehow be *communicated to the Service.*" (Emphasis supplied.) *Id.* at 113, 389 F.2d at 445. And the burden in that regard rests squarely on DAV. *Nat'l Newark & Essex Bank v. United States,* 187 Ct.Cl. at 618, 410 F.2d at 794.

The trial judge also makes much of the fact that DAV did, orally, raise the instant issue with the IRS agents auditing DAV's returns. In addition, the agents agreed to "deny without further investigation the claims for refund as to all issues that had been considered by the Internal Revenue Service during the course of the audit," due to the agents' familiarity with such issues. While DAV did subsequently file a written claim (which was denied by the Service), that claim did not encompass the claim for a deduction for the cost of the names list.

Thus, for there to have been an acceptable claim for refund under section 7422(a) the oral representations made by DAV at the audit must constitute a valid informal claim. We have previously held, however,

---

1. The findings of fact are in the possession of the parties and are not reprinted here. These findings are adopted with the exception of finding number 44. Finding 44 is modified by deleting everything after the first sentence and now states: "The receipts plaintiff obtained from the rental of its donor list constituted UBTI."

that an oral claim does not meet the statutory requirements. *Sicanoff Vegetable Oil Corp. v. United States*, 149 Ct.Cl. 278, 286, 181 F.Supp. 265, 269 (1960); *Wrightsman Petroleum Co. v. United States*, 92 Ct.Cl. 217, 238, 35 F.Supp. 86, 96 (1940), *cert. denied*, 313 U.S. 578, 61 S.Ct. 1095, 85 L.Ed. 1535 (1941). *Cf. American Radiator & Standard Sanitary Corp. v. United States*, 162 Ct.Cl. 106, 113, 318 F.2d 915, 920 (1963); *Rosengarten v. United States*, 149 Ct.Cl. 287, 294, 181 F.Supp. 275, 279, *cert. denied*, 364 U.S. 822, 81 S.Ct. 60, 5 L.Ed.2d 53 (1960).

For an act to constitute a valid informal refund claim, that act must be clear and explicit and "we must be satisfied that [the act] contains the means by which the *Commissioner* will be apprised that a certain tax is being contested without resort to extraneous factors." (Emphasis supplied.) *Rosengarten v. United States*, 149 Ct.Cl. at 294, 181 F.Supp. at 279. As a general rule, an act sufficient to constitute a valid informal claim must take the form of a definite instrument. *Id.* The need for a written claim has been stated to be because

> It is common knowledge that the personnel in governmental departments is constantly changing. Many times several different employees work on a single case. Some of them have before them only such information as is contained in the files. For this reason, and because of the shortness of the memory of man, and for many other reasons, only a written claim is sufficient to meet the requirements of the statute and the need it intended to fill. [*Wrightsman Petroleum Co. v. United States*, 92 Ct.Cl. at 238, 35 F.Supp. at 96.]

Moreover, the fact the agents agreed to promptly deny the subsequently filed claim does not mean the Service waived or did not intend the customary notice function of the claim for refund to be utilized. At best it is a statement that those agents would not change their positions on the issues raised. An appellate conference was also available to DAV, and the reasons for requiring a claim also apply to the appellate level.[2] Therefore, we do not view the agents' statement at the audit level as negating any further purpose for filing a refund claim. Instead, we view these facts as demonstrating a waiver by DAV of any IRS appellate level consideration plus a waiver of DAV's claim for a deduction for the cost of the names list by its failure to make a timely claim therefor.

The trial judge's report, as modified, follows:

## OPINION OF TRIAL JUDGE *

MEROW, *Trial Judge*: In this case, Disabled American Veterans (DAV) seeks to recover a total of $4,267,140.47, plus interest as provided by law, representing the amount of income tax and assessed interest which it paid on May 3, 1976 for the calendar years 1970, 1971, 1972 and 1973. DAV is an organization which has, at all relevant times, been granted an exemption from taxation under section 501(c)(4) of the Internal Revenue Code (code).[1] Accordingly, the sums paid by DAV were assessed by the Internal Revenue Service (IRS) on the basis of its audit and determination that, in each year in question, DAV received unrelated business taxable income (UBTI) as defined in sections 511–13 of the code and implementing Treasury Regulations. DAV asserts that it received no UBTI during the years in question.[2] The central issues in

---

**2.** The purpose of filing a refund claim includes both a notice function and an administrative function. Administratively, a claim for refund allows an opportunity for errors to be determined and corrected and also for limiting the scope of any ensuing litigation. *See Union Pacific*, 182 Ct.Cl. at 109, 389 F.2d at 442.

\* The trial judge's recommended decision and conclusion of law are submitted in accordance with Rule 134(h).

**1.** All references to the Internal Revenue Code or to the code are to the Internal Revenue Code of 1954 unless otherwise stated.

**2.** Alternatively, DAV asserts that: (1) if it is determined that any UBTI was received from

this case are whether amounts received by DAV from a semi-annual Special Solicitations program utilizing premium items and amounts received from the rental of names on its mailing list constituted UBTI.

Faced with examples [3] of tax exempt organizations acquiring and operating, on a tax-free basis, businesses unrelated to the purposes for which the organizations were exempt, in 1950 Congress enacted the unrelated business income provisions which have been carried over substantially unchanged as sections 511–13 of the present code. These provisions subject certain unrelated business income of exempt organizations to the ordinary corporate income tax, thereby placing such operations of tax exempt organizations on a par with their taxpaying competitors. The legislative history of sections 511–13 demonstrates that Congress perceived the tax-free operation of an unrelated trade or business by an exempt organization to provide an unfair advantage over competitors. The primary purpose for subjecting unrelated business income to taxation was to remove this unfair competitive edge.[4]

Under section 511 of the code, only the UBTI of an exempt organization, such as plaintiff, is subject to federal income taxes. Section 512(a) of the code provides that UBTI is the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less allowable deductions. Section 513 defines an unrelated trade or business as:

> * * * any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 * * *.[5]

Accordingly, sections 511–13 impose a tax where an exempt organization obtains income from a trade or business regularly carried on by it, which is not substantially related to the purpose for which the organization is exempt from taxation (aside from a need for income or funds). However, not all unrelated business income is taxable in that Congress, in section 512(b)(1)–(3) of the code, excluded from the scope of these provisions income received from dividends, interest, royalties and real property rents. These comprise the conventional type of passive investment income traditionally earned by exempt organizations. *See* 6 Mertens, The Law of Federal Taxation § 34.14a.[6]

the rental of names on its mailing list, additional deductions should be allowed for sums expended in acquiring new names for the list; (2) if it is determined that any UBTI was received from its Special Solicitations program, a method for computing the extent of such income should be utilized which differs from that employed by IRS in its assessment. Defendant opposes consideration of these alternative claims, asserting that they were not raised in the refund claims DAV filed with IRS.

3. The example most often cited is that of the C. F. Mueller Company, a manufacturer of noodles which was operated for the benefit of the New York University School of Law. As it was operated for a charitable purpose, under the law then in effect, its income was held to be tax exempt. *C. F. Mueller Co. v. Commissioner*, 190 F.2d 120 (3d Cir. 1951); *See* Comment, *The Macaroni Monopoly: The Developing Concept of Unrelated Business Income of Exempt Organizations*, 81 Harv.L.Rev. 1280 (1968).

4. "The problem at which the tax on unrelated business income is directed is primarily that of unfair competition. The tax-free status of section 101 [now 501] organizations enables them to use their profits tax-free to expand operations, while their competitors can expand only with the profits remaining after taxes." (S.Rep.No.2375, 81st Cong., 2d Sess. 28–9 (1950)).

5. Section 513 excludes from the term "unrelated trade or business" any trade or business in which substantially all the work in carrying on the trade or business is performed for the organization without compensation and any trade or business which is the selling of merchandise, substantially all of which has been received by the organization as gifts or contributions. Undisputed facts in the instant matter demonstrate that these exclusions have no application.

6. Income from personal property rents, not connected to the rental of real property, is not

DAV is a corporation formed in 1920 by a group of disabled World War I veterans. It was chartered by an act of Congress in 1932.[7]

The most important activity of DAV is its national service program which involves the employment of nearly 300 national service officers who are, themselves, disabled veterans. These officers represent veterans before Veterans Administration boards with respect to obtaining the benefits to which such veterans are entitled by law. This service is performed free of charge to the veteran and the salary and expenses of the national service officers are paid by funds raised by DAV. DAV also carries out a limited scholarship program and a disaster relief program for which funds are raised. Charitable contributions to DAV are deductible pursuant to section 170 of the code.

Prior to 1962 DAV solicited funds for its operations primarily by mailing "idento-tags" (a small replica of a license plate) to all registered automobile owners in the United States whose names and addresses were available to DAV. These "idento-tags" were not available commercially and were of negligible value. The letter transmitting the tags solicited a contribution to DAV but indicated that the "idento-tag" need not be returned if no contribution was sent. DAV used the "idento-tag" as a way to gain the attention of the potential contributor so that the request for contributions would be read and not promptly discarded.

In the fall of 1962 DAV commenced an annual Special Solicitations mailing which was then expanded to mailings on a semi-annual basis. In this program DAV mailed letters requesting contributions to persons on mailing lists available to DAV, such as its own DAV donor list. Over the years DAV had maintained a list of prior contributors, such as those who had responded to the "idento-tag" mailings. At times the DAV list contained over 11 million names, on computer tape, together with information such as the original source of the name ("idento-tag" or some other mailing list) and the amount of the contribution received in each of the past five DAV solicitations. DAV has, at all relevant times, expended considerable time, effort and expense in maintaining its donor list. Twice a year, just prior to each Special Solicitations mailing, obsolete names were deleted and the names of new contributors added to the DAV's computer tapes.

DAV is a member of the Direct Mail Marketing Association, a trade association composed of organizations connected with the use of direct mail techniques in carrying out their operations. Officials of DAV have regularly attended meetings and conventions where persons interested in direct mail matters assemble. Up to 1965 DAV's semi-annual Special Solicitations program was considered by DAV to be only marginally successful. Prior to 1965 it was suggested to DAV, by persons with knowledge of direct mail techniques, that the use of premium items in these solicitations would improve the response obtained. Suppliers of premium items displayed their wares at direct mail meetings attended by DAV officials.

In a continuing effort to obtain funds to support its exempt purposes, in the fall of 1965 DAV commenced the use of premium items in its Special Solicitations mailings to persons on its own mailing list and to per-

considered to be "passive" and is included in UBTI. *Cooper Tire & Rubber Co. Employees' Retirement Fund v. United States*, 36 T.C. 96 (1961), *aff'd per curiam*, 306 F.2d 20 (6th Cir. 1962).

7. The purposes of DAV, as set forth in its bylaws, are: to uphold and maintain the Constitution and the laws of the United States; to realize the true American ideals and aims for which those eligible to membership fought; to advance the interests and work for the betterment of the wounded, gassed, injured and disabled veterans; to cooperate with the United States Veterans Administration and all other public and private agencies devoted to the cause of improving and advancing the condition, health and interests of all wounded, gassed, injured and disabled veterans; to serve our comrades, our communities and our country; and to encourage in all people that spirit of understanding which will guard against future wars.

sons on other mailing lists which DAV obtained, usually through list brokers, on a rental basis.[8]

DAV's purpose for using premium items in its Special Solicitations mailings was to gain the attention of the recipient so as to obtain a response or, in the case of a prior donor, to upgrade the level of contribution. For example, it was anticipated that, by the use of premiums, a prior $1 contributor could be upgraded into $2 contributor.

DAV obtained a much higher percentage of responses from mailings to names on its own donor list than it did from mailings it made to names on outside lists (so-called "cold-shot" mailings). In the direct mail trade it is understood that the names of persons who respond to the user of an outside list may then be added to the user's own mailing list. Accordingly, while the response obtained from outside lists was not, in itself, satisfactory to DAV as a source of funds in any one mailing, DAV was able to acquire new names for its donor list by mailing to persons on lists it rented from others. Moreover, such new names were needed on a continuing basis to replace obsolete names which were deleted by DAV in the semi-annual process it followed in maintaining its donor list.

Most fund-raising organizations obtain outside lists only from other fund-raising organizations, as experience in direct mail activity has demonstrated that commercial lists do not usually produce a successful level of responses when used by fund-raisers. After exhausting available fund-raising lists, DAV determined, however, that it could obtain a response rate from Special Solicitations mailed to commercial lists sufficient to justify their use. By 1970 the majority of names rented by DAV for its mailings were from commercial lists, such as those maintained by mail order houses or publishing concerns.

By 1970 the premiums DAV used for Special Solicitations were selected on the basis of the results obtained from prior test mailings using two or three proposed items. The premiums producing the most successful response would be used in the next year's Special Solicitations. Generally, DAV found that a premium with a patriotic or historical theme resulted in the greatest net contributions, but DAV had no policy restricting premiums to those with a patriotic or historical theme. The premiums offered in the Special Solicitations were of two varieties: (1) books, maps and charts; (2) wrist calendars (sets of either 7 or 12 months which could be attached to a watch band). The premiums selected by DAV, or comparable items, were available for sale in retail markets.[9]

The Special Solicitations mailing made by DAV to each person on the lists used consisted of a colored envelope containing: (1) a stamped return envelope pre-addressed to DAV; (2) gummed stickers bearing the name and address of the addressee; (3) a small "safety" envelope in which to enclose a contribution; and (4) a single sheet of paper 13 inches by 9½ inches folded in half so as to produce four pages. The two exterior pages of this folded sheet of paper consisted of a letter from DAV's national commander outlining the plight of America's disabled veterans and requesting a contribution. The two interior pages of the folded sheet of paper were devoted to a

8. Numerous organizations, both charitable (fund-raising) and commercial, maintain mailing lists which are available for rent, in whole or in part. Names on such lists are generally made available to interested persons through professional "list brokers" whose occupation consists of arranging, on a commission basis, for the selection and rental of those lists deemed relevant to the needs of a client. In the direct mail trade, the standard transaction arrangement by a list broker would be the rental of names on a list, usually after a prior test mailing had demonstrated that the list would produce successful results, at an agreed-upon price per 1,000 names, for a one-time-only mailing, on dates scheduled by the list owner, of material previously approved by the list owner.

9. Finding of fact No. 13 sets forth each premium used by DAV, together with its unit cost to DAV, its approximate retail value and the amount of contribution required to obtain the premium. Copies of the premiums used by DAV during the period 1970–73 were placed in evidence at the trial of this case.

description, in color, of the premiums offered for contributions in stated amounts of $2, $3, $5 or more.

During the years 1970–73, DAV used two separate letters in each of its semi-annual Special Solicitations mailings. The text of the exterior two pages of each letter was virtually identical, but the interior pages differed. This was because the major mailing used a map or a chart as the $2 premium, and a book plus the map or chart as the $5 premium; whereas the other letter, which constituted a relatively small proportion of the mailings, used a wrist calendar set as one premium and a combination of a wrist calendar set and a book as the $5 premium.[10] The Special Solicitations letters during 1970–73 all contained language, such as "Both premiums for $5.00," representing that DAV would send the premium item(s) depicted when the requisite contribution was sent to DAV. The premium item(s) were mailed by DAV as soon as possible after a contribution was received.

DAV mailed the semi-annual Special Solicitations letters as close as possible to the "drop dates" which its testing had indicated would produce a maximum response. The spring mailings would generally commence in March and the fall mailings would commence in September.[11] From 1971–73 DAV made test mailings without premiums to compare the net contributions received with those mailings in which premiums were used. By 1973 these tests demonstrated to DAV that premiums had served their purpose and that the use of premiums could be discontinued without reducing net contributions. Beginning with the semi-annual mailing in the spring of 1974, DAV discontinued the use of premiums in its Special Solicitations mailings.

Beginning in 1960 DAV began renting names from its donor list. During the periods at issue in this litigation DAV, as a continuing ongoing activity, rented names on its list to both tax exempt and commercial organizations for mailings during all times of the year except for the two weeks before and after DAV's own Special Solicitations mailings. DAV's purpose in renting its mailing list was to gain additional revenue, particularly in the light of the substantial costs it incurred in the regular maintenance of its donor list. In addition, some fund-raising organizations do not make their donor lists available for mailings by other fund-raising organizations except on a reciprocal basis, but the record contains no evidence as to the extent to which this restriction was actually encountered by DAV.[12]

In renting the names on its donor list, DAV followed the usual trade practice of the direct mail industry. To obviate the need for the responsible DAV official to devote a substantial portion of his time to responding to inquiries concerning DAV's list rental terms, "rate cards" were prepared and sent to those list brokers who had previously arranged rentals from the DAV's list.[13] Rates were set by DAV on a level consistent with the rates which DAV was then paying to rent lists from other organizations. The "rate cards" DAV sent to list brokers set forth the various rates charged by DAV (per 1,000 names), the additional charges applicable for various selections (such as by zip code or by recent donors), the form in which the names could be made available (such as on magnetic tape or on heat transfer, gummed or Cheshire labels), and the number of names available in various categories. Because of the axiom in the

---

**10.** By way of illustration, the text of one letter used by DAV is set forth in findings Nos. 17–18.

**11.** Finding of fact No. 15 sets forth the dates consumed by each Special Solicitations program from the spring of 1970 through the fall of 1973.

**12.** During the period in issue, most of the names rented by DAV for its own mailings

were from commercial lists, indicating that any restrictions DAV encountered on obtaining fund-raising lists would have had a minor impact on the extent to which it rented its own donor list.

**13.** For purposes of illustration, the information set forth on the October 1971 "rate card" is set forth in finding of fact No. 27.

direct mail industry that fund-raising lists work better for fund-raising organizations, DAV's rental charges were greater to fund-raising organizations than to commercial organizations.[14] During the period 1970–73 some 81 percent of the names rented by DAV were to other tax exempt organizations and the receipts obtained by DAV from these rentals represented 86 percent of the total amount DAV received from the rental of its mailing list during this period. DAV's rentals to commercial organizations during the period 1970–73 included mail order houses such as Spencer Gifts, Fingerhut Manufacturing Co., Sunset House and Ambassador Leather Goods, organizations which sell merchandise by direct mail, usually by the use of a catalog containing numerous items which can be ordered in the quantities desired, but also, on occasion, on a single-item basis such as by a mailing offering a leather wallet or handbag.

During the period in question it was widely known among list brokers that DAV's mailing list was available for rental, in whole or in part.

In October 1971, IRS commenced an audit of DAV's returns (Form 990, Return of Organizations Exempt From Tax), which extended over a considerable period of time and resulted in the assessment of the tax deficiencies, paid by DAV, which are the subject of this litigation. IRS determined that DAV's Special Solicitations program generated UBTI for its calendar years 1971–73. In measuring the amount of DAV's minimum gross receipts, IRS multiplied the appropriate $2, $3 or $5 amount by the number of such premiums sent out by DAV.[15] IRS also determined that DAV's receipts from the rental of names on its mailing list generated UBTI.

■ DAV contests the determination that it has received UBTI on several grounds. As noted previously, there are three requirements which must be met for any net income received by DAV to constitute UBTI: (1) the income must arise from a trade or business; (2) the trade or business must be regularly carried on; and (3) the trade or business must not be substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the organization's exempt purpose. *See Iowa State University v. United States*, 205 Ct.Cl. 339, 500 F.2d 508 (1974). Plaintiff asserts that the net income it received during the relevant period does not meet these three requirements.

■ As to the trade or business requirement, DAV asserts that its Special Solicitations using premiums cannot be categorized as trade or business activity; that DAV was not selling books, maps, charts or wrist calendars. In response, the government asserts that any activity engaged in for profit (with the expectation of gain) constitutes a business in the sense the phrase "trade or business" is used in determining allowable deductions under section 162 of the code— the standard also made applicable to UBTI determinations pursuant to Treas.Reg. § 1.513–1(b). However, it is clear that not all activity engaged in with the expectation of gain constitutes a "trade or business" as that term is utilized with respect to UBTI.

14. DAV did not restrict the rental of names on its list to any one type of organization but, to avoid donor confusion, did not rent to other veterans' organizations. Also, DAV avoided rental to "controversial" causes and did not rent names for use in political fund-raising for any individual candidate for public office. DAV, in accord with the industry practice, retained the right to examine, inspect and approve the copy which was to be mailed to the names it rented, and did not rent names to any organization whose mailing represented or suggested that DAV was endorsing the product or services offered, nor to any organization whose appeal was suspected by DAV to be fraudulent or not in good taste. As is usual in the industry, DAV inserted "dummy" or "decoy" names in those rented so as to obtain copies of the mailing actually sent to the names it rented. To keep the response rate high and so preserve the value of its list, DAV followed the industry practice of assigning mailing dates to all users of its list to ensure that duplicative mailings to the names on its list during any one period of time would be avoided.

15. Finding of fact No. 36 is a chart showing the amounts so determined by IRS for each premium.

Prior to the years involved in this litigation, S.Rep.No.91–552, 91st Cong., 1st Sess. (1969), U.S.Code Cong. & Admin.News 1969 was issued, including the language:

> The committee, also, intends that when organizations send out low cost articles incidental to the solicitation of charitable contributions, the amounts received are not to be considered as being in exchange for the low cost articles where it is clear that the contributions, less a reasonable administrative cost, fully accrue to the exempt organization.

Treas.Reg. § 1.513–1(b) was subsequently amended (underscored below) to read (in part):

> (b) *Trade or business.* The primary objective of adoption of the unrelated business income tax was to eliminate a source of unfair competition by placing the unrelated business activities of certain exempt organizations upon the same tax basis as the nonexempt business endeavors with which they compete. *On the other hand, where any activity does not possess the characteristics of a trade or business within the meaning of Section 162, such as when an organization sends out low cost articles incidental to the solicitation of charitable contribution, the unrelated business income tax does not apply since the organization is not in competition with taxable organizations.* However, in general, any activity of a Section 511 organization which is carried on for the production of income and which otherwise possesses the characteristics required to constitute "trade or business" within the meaning of Section 162—and which, in addition, is not substantially related to the performance of exempt functions—presents sufficient likelihood of unfair competition to be within the policy of the tax. Accordingly, for purposes of Section 513 the term "trade or business" has the same meaning it has in Section 162, and generally includes any activity carried on for the production of income from the sale of goods or performance of services.

> \*  \*  \*  \*  \*  \*

Activities of producing or distributing goods or performing services from which a particular amount of gross income is derived do not lose identity as trade or business merely because they are carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization.

> \*  \*  \*  \*  \*  \*

In testimony before the Senate Finance Committee prior to issuance of S.Rep.No. 91–552, *supra,* DAV's then national adjutant had described DAV's "idento-tag" program and, in addition, noted that:

> The DAV also sends out other mailings describing its work, requesting donations for it, and suggesting that various books, usually with patriotic themes, will be sent upon receipt of a contribution in a certain amount. The amount of the contribution is far in excess of the commercial value, if any, of the particular book.

The national adjutant also testified:

> Such a solicitation technique is not a commercial business transaction where the motive of the individual in parting with money is the receipt of a quid pro quo in material goods.

2 *Senate Hearings before the Senate Finance Committee on the Tax Reform Act of 1969,* 91st Cong., 1st Sess. 1161 (1969).

Accordingly, given the undisputed fact that plaintiff employed premiums to obtain additional receipts, in determining whether the premium portion of DAV's Special Solicitations programs constituted a trade or business within the requirements of sections 511–13 of the code, the primary factor to consider is whether plaintiff conducted this activity in a competitive manner. If plaintiff had mailed the premiums with its solicitations and had informed the recipients that the premiums could be retained without any obligation arising to make a contribution, it would be clear that this was not an activity operated in a competitive manner and, therefore, was not a trade or business for the purposes of a UBTI determination. *Hope School v. United States,* 612 F.2d 298

(7th Cir. 1980). However, when premiums are advertised and offered only in exchange for prior contributions in stated amounts, the activity takes on much more of a commercial nature. The offers as set forth in DAV's solicitations and the recipient's acceptance by sending a contribution in a stated amount may well have formed a contract binding DAV to furnish the premium item. *See Cutler-Hammer, Inc. v. United States*, 194 Ct.Cl. 788, 441 F.2d 1179 (1971). Nevertheless, in view of the legislative history which clearly indicates that, to constitute a trade or business for UBTI purposes, the activity must be conducted in a competitive fashion, if the contribution required for any one premium was set at an amount greatly in excess of the retail value of the premium item concerned, a competitive situation would not be present. This is not to say that actual competition must be established in order to have UBTI. Sections 511–13 do not confine UBTI to those situations where it is established that some specific aspect of unfair competition has occurred. *Compare Clarence LaBelle Post No. 217 v. United States*, 580 F.2d 270 (8th Cir. 1978), *cert. dismissed*, 439 U.S. 1040, 99 S.Ct. 712, 58 L.Ed.2d 716 (1978); *Hope School v. United States*, 612 F.2d 298 (7th Cir. 1980).

It is concluded that what is necessary to constitute a trade or business for UBTI purposes is that an activity be operated in a competitive, commercial manner. Viewed in this light, the contribution levels DAV established for each premium demonstrates that a portion of these programs constitutes a trade or business and a portion does not. Finding of fact No. 13 shows that the contribution required for the $2 premiums was

substantially in excess of their retail value ($.85 to $1). This is not a trade or business situation. The contribution required for the $3 premium was also substantially in excess of its retail value ($1.50), negating a trade or business situation. The contributions required for the $5 premiums were not, however, so greatly in excess of their retail values ($2.95 to $5.45) as to deprive the activity of the trade or business character which was otherwise present.

Accordingly, it is concluded that only the receipts attributable to $5 premiums for the calendar years at issue can correctly be classified as a trade or business within the requirements of sections 511–13 of the code.[16]

For the same reasons which support the determination that DAV's $5 premium activity constituted a trade or business, it is also concluded that DAV's rental of its mailing list constituted a "trade or business" as that phrase is used with respect to UBTI determinations under sections 511–13 of the code. The rental activity was undertaken by DAV to obtain additional funds. While mailing lists are each unique such that it cannot be said that any one list competes against any other list for rental income, nevertheless the evidence of record demonstrates that at all relevant times there has existed an active direct mail industry in the United States with its own trade practices. During the relevant period of time, DAV was a part of this industry and followed its trade practices in the rental of the DAV donor list. DAV operated in a competitive manner in renting its donor list. The rates were set at levels utilized by other industry members, with higher rates

---

**16.** The language of section 513(c) of the code, as added by section 121(c) of the Tax Reform Act of 1969, provides that: " * * * the term 'trade or business' includes any activity which is carried on for the production of income from the sale of goods or the performance of services. For purposes of the preceding sentence, an activity does not lose identity as a trade or business merely because it is carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization." Accordingly,

the fact that DAV incorporated its premium offers as a part of its charitable solicitations which, in themselves, would not constitute a trade or business, does not cause DAV's $5 premium activity to lose identity as a trade or business. Similarly, the determination that DAV's $2 and $3 premium activity lacked a trade or business status cannot, under section 513(c), affect the determination that the $5 premium activity did constitute a trade or business. *Compare American College of Physicians v. United States*, 209 Ct.Cl. 23, 530 F.2d 930 (1976).

charged to those organizations for which the DAV list had greater value. DAV provided names in several forms on the basis of several available selections, with additional charges assessed for additional services provided. DAV's list rental activity constitutes a trade or business.

Accordingly, with the conclusions that DAV's $5 premium activity and its rental of the DAV donor list constituted a trade or business, a determination must be made whether these trade or business activities were "regularly carried on." The parties agree that rental of the DAV's donor list was regularly carried on, but plaintiff urges that its Special Solicitations mailings did not constitute such activity in view of their semi-annual nature. Treas.Reg. § 1.513–1(c)(2)(ii) notes with respect to "Intermittent activities" that:

> In determining whether or not intermittently conducted activities are regularly carried on, the manner of conduct of the activities must be compared with the manner in which commercial activities are normally pursued by nonexempt organizations. In general, exempt organization business activities which are engaged in only discontinuously or periodically will not be considered regularly carried on if they are conducted without the competitive and promotional efforts typical of commercial endeavors.
>
> \*  \*  \*  \*  \*  \*

DAV argues that its semi-annual Special Solicitations mailings bore no relation whatever to the competitive and promotional efforts typical of commercial mailings such as those for Sunset House and Ambassador Leather Goods—organizations which typically mailed catalogs listing many items for sale. Defendant argues that, while the Special Solicitations were mailed on a semi-annual basis, DAV's activities on this program, in effect, spanned the entire year as is set forth in finding of fact No. 15 and

were comparable to commercial direct mail activity offering merchandise, which also concentrated on two seasons during the year, albeit different periods of time.

An examination of the text of DAV's $5 premium offers (see finding of fact No. 18) demonstrates that even if one considers the program to be intermittent, within the purview of Treas.Reg. § 1.513–1(c)(2)(ii), there exists sufficient similarity to a commercial endeavor to conclude that the activity was regularly carried on. This concept is reinforced by the year-round activity which was required for DAV to undertake semi-annual mailings to the very large number of names involved, followed by the transmittal of premiums to all contributors of the required sum.[17]

The final determination which must be made concerning UBTI is whether DAV's $5 premium activity and the rental of its mailing list were unrelated to its exempt purposes (aside from DAV's need for income or funds or the use DAV made of the profits derived).

Treas.Reg. § 1.513–1(d)(2) provides (in part):

> Trade or business is "related" to exempt purposes, in the relevant sense, only where the conduct of the business activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is "substantially related," for purposes of Section 513, only if the causal relationship is a substantial one. Thus, for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, the production or distribution of the goods or the performance of the services from which the gross income is derived must contribute importantly to the accomplishment of those purposes.

---

17. In *Hope School v. United States*, 612 F.2d 298 (7th Cir. 1980), which involved semi-annual mailings of greeting cards incidental to a charitable solicitation, the court noted: "Neither party disputes that the proceeds in question [the initial $2 received in contributions] are the product of a regularly conducted activity which is not substantially related to the purposes of the Hope School, rather the controversy stems from whether the proceeds were the product of a regularly conducted trade or business."

DAV asserts that the premiums constituted an attention-getting device which caused people receiving DAV's mailings to read the literature and thereby understand DAV's programs.[18] However, the primary purpose for which DAV initiated the use of premiums was to increase the contributions it received and when it was determined that premiums no longer had this result, their use was discontinued. The main causal relationship between premiums and the accomplishment of DAV's exempt purposes, which has been established in this matter, is the fact that, for a time, additional income was generated by offering premiums for contributions. However, this monetary relationship expressly does not qualify to demonstrate that the $5 premiums contributed importantly to DAV's accomplishment of the purposes for which it is tax exempt. It is, therefore, concluded that no substantial relationship has been established between DAV's use of $5 premiums and the accomplishment of its exempt purposes, and the income DAV received from the $5 premiums constitutes UBTI.

Similarly, it is concluded that DAV's rental of its mailing list had no substantial relationship to the accomplishment of its exempt purposes. With the exception of the assertion that such rentals were required in order to obtain other fund-raising lists available only on a reciprocal basis, DAV cites the benefits (in maintaining its donor list) it derived from the rental income it received to establish an important contribution attributable to this activity. As noted previously at page 10, no evidence was offered as to the extent to which the rental of DAV's donor list was related to any reciprocity requirements imposed by other fund-raising organizations. The need for funds or the use made of funds cannot be used to demonstrate that the activity is related to the accomplishment of DAV's exempt purposes. Accordingly, plaintiff has not established that the rental of its donor list was substantially related to the accomplishment of its exempt purposes, and the receipts from rentals constitute UBTI.

Reaching the determination that the income plaintiff received from the rental of its mailing list constituted UBTI does not end the matter, however, for plaintiff asserts that, in that event, the receipts are excluded from taxation under section 512(b)(2) as "* * * royalties (including overriding royalties) whether measured by production or by gross or taxable income from the property, and all deductions directly connected with such income." In the direct mail industry, the receipts from list rentals are called either rents or royalties. However, the terms as used in the industry are not controlling with respect to determining whether the receipts in question constitute royalties as that term is used in section 512(b)(2) of the code. *Morgan v. Commissioner*, 309 U.S. 78, 80–1, 60 S.Ct. 424, 425–26, 84 L.Ed. 585 (1940); *Montgomery Coca-Cola Bottling Co. v. United States*, 208 Ct.Cl. 950 (1975). As discussed previously, page 6, section 512(b) excludes from taxation the conventional type of passive investment income traditionally earned by exempt organizations (dividends, interest, annuities, real property rents). *See also J. E. & L. E. Mabee Foundation, Inc. v. United States*, 389 F.Supp. 673 (1975), *aff'd*, 533 F.2d 521 (10th Cir. 1976). DAV's list rentals are the product of extensive business activity by DAV and do not fit within the types of "passive" income set forth in section 512(b). The "royalties" there referenced are those which constitute passive income, such as the compensation paid by a licensee to the licenser for the use of the licenser's patented invention, 4 Deller's Walker On Patents (2d ed.) § 413, or the share of production reserved to the owner of property for permitting another to work mines and quarries or drill for oil or gas, *Commissioner v. Clarion Oil Co.*, 148 F.2d 671 (D.C.Cir.), *cert. denied*, 325 U.S. 881, 65 S.Ct. 1575, 89 L.Ed. 1997 (1945). For the

---

**18.** DAV also argues that the premiums caused people to refer disabled veterans to DAV in order that DAV might provide assistance to them. No firm evidence was submitted to demonstrate that the *premiums* had any such effect and no finding in this regard has been made.

same reason that personal property rentals constituting unrelated business income are taxable, *Cooper Tire & Rubber Co. Employees' Retirement Fund v. Commissioner*, 36 T.C. 96 (1961), *aff'd per curiam*, 306 F.2d 20 (6th Cir. 1962), it is concluded that DAV's receipts from the rental of its mailing list cannot be classified as "royalties" as that term is used in section 512(b)(2) of the code. Rather, DAV's list rental income constitutes UBTI pursuant to sections 511–13 of the code.

Finally, DAV claims certain errors existed in the IRS assessments against it which should be resolved if it is concluded that DAV did receive UBTI.

First, DAV argues that if it is determined that any of its premium income constituted UBTI, then the computation of the gross income involved should be based upon the fair market value (retail price) of the premiums involved and not on the contribution level which DAV set as a requirement to obtain the premium. In assessing UBTI against DAV, the IRS computed the minimum gross income involved by multiplying the number of premiums sent by the contribution level DAV required to obtain the premium. While it has been concluded that DAV set the contribution levels for its $5 premiums in a sufficiently competitive manner so as to qualify the activity as a trade or business within the requirements of sections 511–13 of the code, nevertheless in most (but not all) instances the retail values of the $5 premiums were less than $5. DAV's argument is that the difference between a lower retail value of any premium and $5 should not be included in UBTI, but should be classified as a charitable contribution.

Defendant does not take issue with the merits of DAV's argument as to the proper measurement of premium gross income.[19] Rather, defendant contests the jurisdiction of the court to consider the matter, by asserting that the issue was not incorporated in refund claims which plaintiff filed with IRS as a prerequisite to the instant suit, pursuant to section 7422(a) of the code. In the absence of a refund claim covering the matter at issue, it cannot be considered by the court. *Union Pacific R. R. v. United States*, 182 Ct.Cl. 103, 108–09, 389 F.2d 437, 442 (1968).

However, plaintiff's refund claims contained language asserting "DAV's net income from special solicitations * * * did not constitute unrelated business income within the meaning of Sections 511–513 of the Internal Revenue Code."[20] This language encompasses the issue as to whether the difference between a lower premium retail value and $5 constituted unrelated business income as assessed by IRS. In fact, defendant concedes (brief, p. 61) that this refund language encompassed the analogous issue, discussed previously, as to whether list rental income must be excluded from UBTI as a "royalty" pursuant to section 512(b)(2) of the code.

Accordingly, it is concluded that the issue as to the appropriate measurement of premium gross income is properly before the court and that plaintiff's argument prevails. The gross income DAV received from $5 premiums must be determined by using the retail value of the premiums involved, and not by using the $5 contribution level set by DAV. The use of the retail value of the premiums as the gross income obtained is consistent with the policy underlying the taxing of unrelated business income, as it will serve to place the activity on a par with any taxpaying competitors in the retail markets.

■ In summary, it is determined that plaintiff has received UBTI for the years in question only from: (1) the $5 premium

---

**19.** The decision in *Hope School v. United States, supra*, indicates that the UBTI assessed in that case was computed by IRS in a manner consistent with DAV's argument in the instant litigation. Moreover, computing UBTI by using the retail price of the premiums involved would be consistent with the treatment required for

charitable donations under section 170 of the code, as set forth in Rev.Rul. 67–246, 1967–2 C.B. 104.

**20.** The text of DAV's refund claim is set forth as finding of fact No. 40.

portion of its Special Solicitations program with gross income for this portion to be computed from the retail value of the premiums concerned; and (2) the rental of its donor list.

Having paid federal income taxes on additional assessments not sustained in this matter, DAV is entitled to recover a partial refund of the taxes paid for the years in question, together with interest as provided by law. Judgment in favor of plaintiff is so entered, with the determination of the exact amount of recovery to be made in further proceedings, if required, under Rule 131(c).

### CONCLUSION OF LAW

After consideration of all the arguments of the parties, for the reasons discussed above, we conclude that plaintiff is entitled to a partial refund of taxes paid, together with interest as provided by law; and judgment is so entered. The exact amount of recovery will be determined by the trial judge pursuant to Rule 131(c).