FRATERNAL ORDER OF POLICE ILLINOIS STATE TROOPERS LODGE NO. 41, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 9035-81, 3944-83.     Filed September 29, 1986.

*John J. Vassan, Patrick B. Mathis,* and *George E. Marifian,* for the petitioner.

*Matthew J. Fritz,* for the respondent.

SHIELDS, *Judge:* Respondent determined deficiencies in petitioner's income tax as follows:

---

[8]In view of our resolution of the issue, we need not comment upon the other arguments of petitioner.

| Year ended Sept. 30— | Deficiency |
|---|---|
| 1976 | $65,769.80 |
| 1977 | 83,174.05 |
| 1978 | 42,677.52 |
| 1979 | 47,620.63 |
| 1980 | 94,353.90 |

The issue for decision is whether the receipts of petitioner generated by certain listings in The Trooper magazine constitute income derived from an unrelated trade or business under section 511,[1] and if so, whether such receipts are excludable from unrelated business taxable income as royalties under section 512(b)(2).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference.

Petitioner the Fraternal Order of Police, Illinois State Troopers Lodge Number 41 (FOP), is a not-for-profit corporation organized under the laws of the State of Illinois and had its principal place of business in Springfield at the time it filed its petition. Petitioner is an exempt organization under section 501(c)(8). Its active members are regularly appointed and commissioned police officers in the Illinois Department of Law Enforcement or Troopers in the Illinois State Police. FOP's constitution and bylaws state that its purpose is to assist worthy members, their families, widows, and orphans.

In August 1975, FOP formed the Troopers Alliance (Alliance). Alliance had basically the same membership as FOP and was formed to carry out the specific goal of providing money for hospitalization and dental programs for members and their families.

In September 1975, Alliance entered into a solicitation and publishing agreement (agreement I) with Organization Services Corp. (OSC) for the publication of a magazine known as The Trooper. Under agreement I, Alliance was to

---

[1] All section references are to the Internal Revenue Code of 1954 as amended, and in effect during the years in issue unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise indicated.

receive 20 percent of the "gross advertising revenue actually collected" by OSC. Agreement I referred to parties solicited to place "listings" in the magazine as "advertisers" and to "listings" as "advertising." The solicitation program was referred to as the "ad solicitation program," the "advertising marketing program," and the "marketing of advertising." Agreement I also provided that OSC was to determine the "advertising rates * * * for local and national advertisers" and referred to the receipts to be derived from the contracts as "advertising revenue."

On December 20, 1975, Alliance assigned all of its right, title, and interest in agreement I to petitioner. On December 23, 1975, petitioner and OSC canceled agreement I and entered into a second solicitation and publishing agreement (agreement II). Agreement II was identical in all material respects to agreement I, except that under the new agreement petitioner was given greater control over the bank account into which the revenues were to be deposited. Petitioner's executive committee was then informed that Alliance had been disbanded and that its "ad solicitation program" would thereafter be conducted by petitioner. The committee was also advised that future proceeds from the program would be used to provide death benefits, legal assistance, scholarships, hardship assistance, and possibly dental insurance for FOP members and their families.

On December 24, 1978, petitioner and OSC entered into another publishing agreement (agreement III). Agreement III provided that OSC was to publish each issue of The Trooper within 10 weeks after having collected $150,000 in "advertising revenue." Agreement III also increased FOP's share of "gross advertising revenue actually collected" from 20 percent to 23 percent.

The Trooper is comparable in quality to most nationally published commercial magazines, and in content, is almost identical to Law and Order, an independent magazine published for policemen. Its editorials and articles are of particular interest to police officers and cover a wide range of professional, commercial, consumer, and leisure topics. The Trooper's circulation during the years in issue was approximately 2,000. Copies were distributed to FOP members and associate members, businesses and individuals

having listings in The Trooper, Illinois legislators and other public officials, as well as other persons designated by petitioner from time to time. One of petitioner's officers served as executive editor of the magazine and petitioner had the right to censor text, editorials, and business listings, as well as to control any reprints.

The business listings in The Trooper were of two types, both of which covered a wide range of professional, commercial, consumer, and leisure goods or services. The first type of listing was the business directory which classified and arranged the listers in the same manner as the "yellow pages" of a telephone directory. The business directory was preceded by this statement:

ON THE FOLLOWING PAGES, listed by category of service or product, are advertisers who support The Trooper magazine. Consider these fine companies when making purchases for yourself or your family.

The second type of listings were referred to as "large listings" and included such well-known companies or products as American Airlines, Michelob Beer, and Johnny Carson Clothes, as well as Midas Mufflers and Ryder Trucks. The Trooper had an "Advertisers' Index" which contained the name of the sponsor of each large listing and the page upon which its listing was located. Large listings contained the usual elements associated with advertisements such as blocking, illustrations, signatures, trademarks, and emblems. Many of the large listings contained well-known slogans used by the sponsors in their national advertising.

OSC employed an independent contractor to solicit listings for individuals and corporations. The contractor or one of his employees would contact a potential lister and, after a brief introduction, would inform the potential lister that FOP was putting together the next issue of The Trooper, the proceeds from which would be added to FOP's death fund and used to aid the families of policemen and troopers killed or injured in the line of duty. The potential lister would then be asked to sponsor a "nice listing" in the magazine. All solicitations were monitored by FOP members.

The rates for listings during the years in issue were as follows:

| *Large listings:* | | *Business directory listings:* | |
|---|---|---|---|
| *Size* | *Cost* | *Size* | *Cost* |
| Two pages | $1,200 | 2 column inches | $100 |
| Full page | 665 | 1 column inch | 75 |
| 2/3 page | 525 | 3/4 column inch | 50 |
| 1/2 page | 415 | 4 lines | 35 |
| 1/3 page | 345 | 2 lines | 25-30 |
| 1/4 page | 285 | 1 line | 15-20 |
| 1/6 page | 195 | | |

Each sponsor of a listing in The Trooper received an acknowledgement form which read in part, as follows:

THE TROOPER OFFICAL PUBLICATION OF
TROOPERS LODGE #41

---

BILLING INFORMATION      ADVERTISER INFORMATION

cost _____

           _____    _____
total _____     name of advertising co.     date

         _____
         street      town county     zip

         _____
         tel. no.       nature of business

_____    AD INFORMATION
method payment

_____ check _____ cash    _____    _____
         size of ad       comment

         _____
         issue

Businesses listing in The Trooper frequently noted on their checks that the payments were for "advertising." The bank account for the "advertising marketing program" was in petitioner's name and was controlled by petitioner.

The number of issues of The Trooper published during the years under consideration were as follows:

| *Year ended Sept. 30—* | *Number of issues* |
|---|---|
| 1976 | 3 |
| 1977 | 8 |
| 1978 | 4 |
| 1979 | 5 |
| 1980 | 7 |

Petitioner received the following amounts from OSC for business listings during the years at issue:

| Year ended Sept. 30— | Amounts |
|---|---|
| 1976 | $864,806.00 |
| 1977 | 1,035,264.00 |
| 1978 | 890,973.00 |
| 1979 | 765,448.50 |
| 1980 | 1,068,614.57 |
| Total | 4,625,106.07 |

In its unrelated business taxable income for the taxable years ended September 30, 1976, through September 30, 1979, petitioner included as "gross advertising income" receipts from the large listings but not the receipts from the business directory. For the taxable year ended September 30, 1980, none of the listing receipts were included in unrelated business taxable income.

In his notice of deficiency, respondent determined that all of petitioner's receipts from the listings constituted unrelated business taxable income.

## OPINION

Section 511[2] imposes a tax upon a tax-exempt organization's "unrelated business taxable income."[3] Sec. 511(a).

---

[2]SEC. 511. IMPOSITION OF TAX ON UNRELATED BUSINESS INCOME OF CHARITABLE, ETC., ORGANIZATIONS.

(a) CHARITABLE, ETC, ORGANIZATIONS TAXABLE AT CORPORATION RATES.—

(1) IMPOSITION OF TAX.—There is hereby imposed for each taxable year on the unrelated business taxable income (as defined in section 512) of every organization described in paragraph (2) of a tax computed as provided in section 11. In making such computation for purposes of this section, the term "taxable income" as used in section 11 shall be read as "unrelated business taxable income."

(2) ORGANIZATIONS SUBJECT TO TAX —

(A) ORGANIZATIONS DESCRIBED IN SECTIONS 401(A) AND 501(C).—The tax imposed by paragraph (2) shall apply in the case of any organization (other than a trust described in subsection (b) or an organization described in section (c)(1)) which is exempt, except as provided in this part of part II (relating to private foundations), from taxation under this subtitle by reason of section 501(a).

[3]Prior to 1950, a tax-exempt organization's income was not taxable if it was used to further the organization's tax-exempt purposes, regardless of the income's source. See *Trinidad v. Sagrada Orden.*, 263 U.S. 578, 581 (1924); *C. F. Mueller Co. v. Commissioner*, 190 F.2d 120 (3d Cir. 1951); *Roche's Beach, Inc. v. Commissioner*, 96 F.2d 776 (2d Cir. 1938). The taxation of business income not "substantially related" to an exempt organization's objectives was first imposed by the Revenue Act of 1950 in response to perceived abuses by tax-exempt organizations engaged in profit-making activities. See S. Rept. 2375, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 483, 503-508. These statutes were directed primarily at the problem of unfair competition by tax-exempt organizations. H. Rept. 2319, 81st Cong. 2d Sess. (1950), 1950-2 C.B. 380, 409. As originally enacted, the 1950 Act did not force exempt organizations to abandon commercial enterprises, rather "it struck a balance between its two objectives of encouraging benevolent enterprise and restraining unfair competition by imposing a tax on the

"Unrelated business taxable income" is defined by section 512(a)(1) to mean "the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business." "Unrelated trade or business," in turn, is defined as "any trade or business the conduct of which is not substantially related * * * to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption." Sec. 513(a).[4] Therefore, petitioner's business listing receipts are taxable if (1) the publication of the business listings is a "trade or business," (2) it is regularly carried on, and (3) it is not substantially related to petitioner's tax-exempt purposes. Sec. 1.513-1(a), Income Tax Regs.; *United States v. American Bar Endowment*, 475 U.S. __ (1986); *United*

---

'unrelated business taxable income' of tax-exempt organizations." *United States v. American College of Physicians*, 475 U.S. ___, ___ (1986).

[4]As it relates to this case, the pertinent provisions of section 513 are subsections (a) and (c) which provide:

(a) GENERAL RULE.—The term "unrelated trade or business" means in the case of any organization subject to the tax imposed by section 511, any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 (or in the case of an organization described in section 511(a)(2)(B), to the exercise or performance of any purpose or function described in section 501(c)(3), except, that such a term does not include any trade or business—

(1) in which substantially all the work in carrying on such trade or business is performed for the organization without compensation, or

(2) which is carried on, in the case of an organization described in section 501(c)(3) or in the case of a college or university described in section 511(a)(B), by the organization primarily for the convenience of its members, students, patients, officers, or employees, or, in the case of a local association of employees described in section 501(c)(4) organized before May 27, 1969, which is the selling by the organization of items of work-related clothes and equipment and items normally sold through vending machines, through food dispensing facilities, or by snack bars, for the convenience of its members at their usual place of employment; or

(3) which is the selling of merchandise, substantially all of which has been received by the organization as gifts or contributions.

*     *     *     *     *     *     *

(c) ADVERTISING, ETC., ACTIVITIES.—For purposes of this section, the term "trade or business" includes any activity which is carried on for the production of income from the sale of goods or the performance of services. For purposes of the preceding sentence, an activity does not lose identity as a trade or business merely because it is carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization. Where an activity carried on for profit constitutes an unrelated trade or business, no part of such trade or business shall be excluded from such classification merely because it does not result in profit.

*States v. American College of Physicians*, 475 U.S. ____ (1986).

Respondent determined that petitioner's publication of The Trooper constituted an unrelated trade or business within the meaning of section 513 and the receipts therefrom were "unrelated business taxable income" under section 511. Petitioner contests respondent's determination on alternative grounds: (1) The publication of The Trooper does not constitute a trade or business within the meaning of section 513; and (2) even if the publication is a trade or business, the receipts generated from the business listings constitute royalties excluded under section 512(b)(2).

As to the first ground, petitioner concedes that the publication of the paid business listings is regularly carried on and is not substantially related to its exempt purposes. However, petitioner argues that the receipts from the listings are not taxable because: (1) The listings are not advertising; and (2) their publication did not constitute a "trade or business" under section 513(c). Petitioner bears the burden of proof. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a).

We note that neither the Code nor respondent's regulations define the term "advertising" or "advertisement." However, after carefully examining the record and copies of The Trooper we are convinced that both the larger listings and the business listings constitute "advertising." To conclude otherwise we would have to ignore the fact that the vast majority of the listings in The Trooper are composed of slogans, logos, trademarks, and other information which is similar, if not identical in content, composition, and message to the listings found in other professional journals, newspapers, and the "yellow pages" of telephone directories. We also note that the contracts with OSC, FOP's business forms, and the magazine itself repeatedly use such words and phrases as "advertising revenues," "advertisers," "prospective advertisers," "advertising marketing program," and "advertising," to describe the listings and related activities.

With regard to petitioner's argument that the publication of advertising in The Trooper is not a trade or business we note that on December 12, 1967, the Treasury Department

promulgated regulations under section 513, as it then existed, concerning the application of the unrelated business tax to business activities constituting only part of a much larger endeavor which is admittedly exempt.[5] In response to criticism of this regulation, section 513(c) was amended, effective January 1, 1970, to read as set forth in the margin at footnote 4. With regard to the amendment, the House committee report stated:

*Your committee believes that a business competing with taxpaying organizations should not be granted an unfair competitive advantage by operating tax free unless the business contributes importantly to the exempt function. It has concluded that by this standard, advertising in a journal published by an exempt organization is not related to the organization's exempt functions, and therefore it believes that this income should be taxed.*

*　　*　*　　*　*　　*　*　　*　*　　*　*　*

Under this provision, it is anticipated that advertising income from publications (whether or not the publications are related to the exempt purpose of the organization) will constitute unrelated business income to the extent it exceeds the expenses related to the advertising, and, if the editorial aspects of publication are carried on at a loss, to the extent it exceeds this loss.

[H. Rept. 91-413 (1969), 1969-3 C.B. 199, 232. Emphasis supplied.]

---

[5]The regulations promulgated under sec. 513 at that time contained the following definition of a trade or business:

(b) *Trade or business.*—The primary objective of adoption of the unrelated business income tax was to eliminate a source of unfair competition by placing the unrelated business activities of certain exempt organizations upon the same tax basis as the nonexempt business endeavors with which they compete. In general, any activity of a section 511 organization which is carried on for the production of income and which otherwise possesses the characteristics required to constitute "trade or business" within the meaning of section 162—and which, in addition, is not substantially related to the performance of exempt functions—presents sufficient likelihood of unfair competition to be within the policy of the tax. Accordingly, for purposes of section 513 the term "trade or business" has the same meaning it has in section 162, and generally includes any activity carried on for the production of income from the sale of goods or performance of services. Thus, the term "trade or business" in section 513 is not limited to integrated aggregates of assets, activities and good will which comprise businesses for the purposes of certain other provisions of the Internal Revenue Code. Activities of producing or distributing goods or performing services from which a particular amount of gross income is derived do not lose identity as trade or business merely because they are carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization. Thus, for example, the regular sale of pharmaceutical supplies to the general public by a hospital pharmacy does not lose identity as trade or business merely because the pharmacy also furnishes supplies to the hospital and patients of the hospital in accordance with its exempt purposes or in compliance with the terms of section 513(a)(2). *Similarly, activities of soliciting, selling, and publishing commercial advertising do not lose identity as trade or business even though the advertising is published in an exempt organization periodical which contains editorial matter related to the exempt purposes of the organization.* [Sec. 1.513-1(b), Income Tax Regs. Emphasis supplied.]

In the Senate committee report, the following comments appear:

*The committee agrees with the House that the regulations reached an appropriate result in specifying that when an exempt organization carries on an advertising business in competition with other taxpaying advertising businesses, it should pay a tax on the advertising income.* * * * For this reason, the committee agrees with the House that the regulations, insofar as they apply to advertising and related activities, should be placed in the tax laws. [S. Rept. 91-552 (1969), 1969-3 C.B. 423, 472. Emphasis supplied.]

Recently the Supreme Court had occasion to consider section 513(c) as amended and stated that "The statute clearly established advertising as a trade or business * * * " [which] "is conceded in this case, as it must be, because Congress has declared unambiguously that the publication of paid advertising is a trade or business activity distinct from the publication of accompanying educational articles and editorial content." *United States v. American College of Physicians*, 475 U.S. ___ (1986).

Another factor which supports a finding that petitioner's listings constituted a trade or business is the fact that FOP's arrangements with OSC were obviously conducted with a profit motive and, in fact, were very profitable. The profit is not surprising since under the arrangement, FOP's share of the receipts was based upon gross revenue with no risk or expense involved.

Petitioner would have us discount its profit motive and focus instead upon whether its listing activities constituted unfair competition with others in the advertising field. In so arguing, petitioner asserts that under our rule in *Golsen v. Commissioner*, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1970), cert. denied 404 U.S. 940 (1971), we are constrained to follow the ruling to that effect by the Court of Appeals to which this case is appealable in *Hope School v. United States*, 612 F.2d 298, 303, 304 (7th Cir. 1980). Assuming, without so holding, that the Seventh Circuit's ruling in *Hope School* is still viable after the decision of the Supreme Court in *United States v. American College of Physicians, supra*, we disagree with petitioner because we here are faced with different facts from those found in *Hope School*. In that case, an exempt school under section

501(c)(3) solicited contributions by mailing greeting cards to potential donors who could keep the cards without obligation whether or not they sent the school a contribution. Here, we are presented with obvious advertising in the magazine of a section 501(c)(8) organization. Therefore, the decision in *Hope School* cannot be considered "squarely on point." *Golsen v. Commissioner*, 54 T.C. at 757.

From all of the above, the conclusion is inescapable that petitioner's listing activities constituted advertising and as such amounted to a trade or business. Since petitioner has conceded that such activities were regularly carried on and were not substantially related to its exempt purposes, the receipts from such activities are "unrelated business taxable income."

Petitioner further contends, however, that even if its listing receipts constitute "unrelated business taxable income" under section 513, such receipts are royalties and are excluded from taxation by section 512.

Section 512(a)(1) states the general rule that:

Except as otherwise provided in this subsection, the term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business, both computed with the modifications provided in subsection (b).

Insofar as applicable here, section 512(b)(2) provides that one of the modifications referred to in subsection (a) is that "there shall be excluded all royalties * * * whether measured by production or by gross or taxable income."

Generally, a royalty is a payment for the use of a right such as a trademark, trade name, service mark, or copyright, whether or not the property represented by the right is used. See, e.g., *Commissioner v. Wodehouse*, 337 U.S. 369 (1949); *Rohmer v. Commissioner*, 153 F.2d 61 (2d Cir. 1946); *Commissioner v. Affiliated Enterprises, Inc.*, 123 F.2d 665 (10th Cir. 1941), cert. denied 315 U.S. 812 (1942); *Sabatini v. Commissioner*, 98 F.2d 753 (2d Cir. 1938). However, in *Disabled American Veterans v. United States*, 650 F.2d 1178, 1189 (Ct. Cl. 1981), the Court of Claims concluded that royalties excluded under section 512(b)(2):

are those which constitute passive income, such as the compensation paid by a licensee to the licenser for the use of the licenser's patented invention, * * * or the share of production reserved to the owner of property for permitting another to work mines and quarries or drill for oil or gas * * * [650 F.2d at 1189; citations omitted.]

See also *J.E. & L.E. Mabee Foundation, Inc. v. United States*, 389 F. Supp. 673 (N.D. Okla. 1975), affd. 533 F.2d 521 (10th Cir. 1976).

Whether an item of income falls within one of the modifications provided in section 512(b) is to be determined from all the facts and circumstances in each case. Sec. 1.512(b)-1, Income Tax Regs. In the determination, petitioner has the burden of proof. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a).

On this issue, petitioner contends that it sold to OSC the right to exploit petitioner's name in return for a percentage of the gross advertising revenues and consequently the listing receipts were in actuality royalty payments. On the other hand, respondent contends that the receipts cannot be considered royalties because petitioner's role in the publication of The Trooper was not passive. We agree with respondent because under the various agreements with OSC petitioner had final authority over the content of any issue of the The Trooper and had the right to provide its executive editor, to select the subject of and prepare its editorials and feature articles, to oversee and monitor the solicitor's activities in the advertising program, to control the program's bank account, and to control the reprint of any material published in The Trooper.

We conclude, therefore, that petitioner's role was not passive, the receipts from the listings did not constitute royalties, and such receipts are not excluded under section 512(b)(2) from petitioner's unrelated business taxable income.

*Decision will be entered under Rule 155.*