IIT RESEARCH INSTITUTE, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 655–80T.

United States Claims Court.

Oct. 9, 1985.

Dean C. Cameron, Chicago, Ill., for plaintiff; Richard J. Hoskins, Paul R. Wysocki and Schiff Hardin & Waite, of counsel.

Mildred L. Seidman and Mary M. Abate, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., for defendant.

## OPINION

PHILIP R. MILLER, Judge:

This is a suit for refund of taxes for the year 1976, allegedly erroneously collected under the unrelated business taxable income provisions, 26 U.S.C. §§ 511–513 (1982), of the 1954 Internal Revenue Code. The question at issue is whether or not the income from some of the plaintiff's research contracts for government and business was derived from trade or business unrelated to plaintiff's exemption as a corporation organized and operated exclusively for scientific purposes.

### I.

Plaintiff, IIT Research Institute (hereinafter "IITRI"), was organized in 1936 by the Board of Trustees of Armour Institute of Technology (now known as the Illinois Institute of Technology) and is one of three independent not-for-profit research institutes formed before World War II. The first research institute was founded in 1927 from a department at the University of Pittsburgh; the second was founded in 1929 pursuant to the will of an industrial-

ist. Following World War II, eleven additional research institutes were formed.

These research institutes were established to stimulate industrial growth and technological development by making research services available to industry on a contract basis. All of the not-for-profit research institutes have significant common characteristics, including: 1) they are separate organizations from the universities and other institutions which were instrumental in their creation; 2) they maintain their own full-time staff, facilities and management; 3) they exist primarily to perform research and development on a contract basis for government and industry; 4) they are multi-disciplinary in nature and serve a multiplicity of clients; 5) they have all received letters of exemption from the I.R.S. acknowledging them to be exempt under section 501 of the Code or its predecessor; and, 6) they all use income exceeding expenses to improve and expand operations and do not distribute any earnings to any private shareholder or other individual.

IITRI's research activities are divided into divisions corresponding to different disciplines or scientific and technological specialties, to wit: (1) Metals; (2) Chemistry and Chemical Engineering; (3) Mechanics of Materials; (4) Electronics; (5) Management and Computer Sciences; (6) Engineering Mechanics; (7) Life Sciences; and (8) Medical Sciences and Engineering. A research director heads each division of IITRI and is responsible for its day-to-day operations.

On March 31, 1941, plaintiff, then known as Research Foundation of Armour Institute of Technology, received a letter from the Internal Revenue Service ruling that it was tax exempt. Subsequently, on April 25, 1980, the I.R.S. acknowledged that plaintiff's tax exempt status under § 501(c)(3) of the Internal Revenue Code continued at least through its fiscal year ended August 31, 1977. Plaintiff's exemption was recognized under § 501(c)(3), as a corporation organized and operated exclusively for scientific purposes, no part of the earnings of which inures to the benefit of any private shareholder or individual. IITRI's tax exempt status is not challenged by the government in this litigation.

During 1976, the taxable year at issue, plaintiff carried on numerous research assignments of various types pursuant to contracts. Plaintiff normally handles in excess of 650 projects annually. Some projects are initiated as a result of decisions by plaintiff's officers or personnel that a particular investigation or study is deemed desirable or appropriate to pursue without outside sponsorship ("in-house contracts"). Other contracts are sponsored by entities outside of IITRI's organization, such as government agencies or industrial organizations. Some contracts are multisponsored, and any given contract can include both governmental and non-governmental sponsors. In certain instances, IITRI is a subcontractor of contractors with the government.

An agreement with an agency of the Federal government or with an agency of a state or local government generally is executed on a standard form contract devised by the governmental agency. An agreement with an industrial sponsor is usually executed on a standard form devised by IITRI, although variations and modifications of particular provisions are common in the case of contracts involving large sums. In some cases a contract may be specifically negotiated for a single research project. Approximately 85 percent of IITRI's research is conducted pursuant to contracts with federal or state government agencies.

The determinations as to which contracts to pursue are made by IITRI's Research Committee, composed of the directors of the various research divisions during weekly meetings. The Committee decides first whether to bid for a project and then determines how much to bid. A contract proposal is generally initiated by a research director interested in pursuing that particular line of research. In determining whether to bid on a contract the committee considers: (1) whether the staff is capable of

performing the task; (2) the project's relationship to the development of the particular scientific field; and (3) the probability that IITRI's bid will be successful. The elements included in the price at which IITRI bids on the project includes the salaries of those employees who will be involved, the overhead, and a fee. The fee is designed to allow accumulations of surplus for reserves and also the increased cost of new equipment. Usually the fee IITRI charges the government is 6 percent of its direct costs on the project. The fee for industrial contracts tends to be higher than 6 percent. These procedures are followed by the Research Committee for all contracts and all divisions and do not vary according to sponsor nor any other distinction among contracts.

All of the plaintiff's income exceeding expenses from such projects is used to improve and expand its operations. IITRI's compensation to its personnel is reasonable and it does not distribute its earnings to any private shareholder or individual.

Patents may result from plaintiff's research. Such a patent may become the property of plaintiff or of the sponsor, depending upon the terms of the specific contract. In 1976, IITRI received gross royalty income of $260,021, primarily from the licensing of patents.

For its fiscal year ending in 1976, plaintiff's gross accrued revenue was $24,963,590 from government contracts and $3,575,440 from industrial contracts. On or about January 13, 1977, plaintiff filed Form 990, Return of Organization Exempt from Income Tax, for fiscal year 1976, which reported no unrelated business taxable income. On November 14, 1976, the Internal Revenue Service (I.R.S.) issued to plaintiff a statutory notice of deficiency asserting that IITRI had net unrelated business taxable income of $256,788.74, upon which unrelated business income tax of $109,758.59 was due. On January 30, 1980, IITRI paid the deficiency and on April 25, 1980, IITRI filed its claim for refund. The Commissioner of Internal

Revenue rendered no decision on plaintiff's claim and plaintiff filed this suit more than 6 months after filing its claim for refund.

To facilitate the trial of this case, the parties agreed that, of the approximately 650 contracts which plaintiff handles annually, 58 contracts were illustrative or representative (as to content) of IITRI's activities in 1976, and that the liability portion of this suit could be disposed of entirely by reference to those 58 contracts. For the purposes of this suit, defendant challenged 24 of these contracts as being substantially unrelated to plaintiff's exempt activity. The other 34 contracts, the government concedes, were substantially related to plaintiff's exempt activity and were nontaxable.

## II

I.R.C. § 501 provides that certain organizations shall be exempt from income tax. Subsection 501(c)(3) includes in the list of such exempt organizations "Corporations * * * organized and operated exclusively for * * * scientific * * * purposes * * *, no part of the net earnings of which inures to the benefit of any private shareholder or individual."

However, § 511 imposes a tax on the unrelated business taxable income of organizations otherwise exempt under § 501(c). Section 512(a)(1) defines "unrelated business taxable income" as "the gross income derived by any organization from any unrelated trade or business (as defined in § 513) regularly carried on by it, less the deductions allowed by this chapter."

For purposes of this tax, § 513(a) defines such "unrelated trade or business" to be:

any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501.

Section 513(c) in turn clarifies the meaning of "trade or business" as used in § 513(a) as follows:

> For the purposes of this section, the term "trade or business" includes any activity which is carried on for the production of income from the sale of goods or the performance of services. For purposes of the preceding sentence, an activity does not lose its identity as a trade or business merely because it is carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization.

Treasury Regulation § 1.513.1(a) (1976), interpreting the language of § 513, sets out the following three part test to determine whether a tax exempt organization's activities generate income subject to the unrelated business tax:

> [G]ross income of an exempt organization subject to the tax imposed by section 511 is includable in the computation of unrelated business taxable income if: (1) It is income from trade or business; (2) such trade or business is regularly carried on by the organization; and (3) the conduct of such trade or business is not substantially related (other than through the production of funds) to the organization's performance of its exempt functions.

All three of these requirements must be met before an organization may be held to have unrelated business taxable income. *Disabled American Veterans v. United States*, 227 Ct.Cl. 474, 486, 650 F.2d 1178, 1185 (1981); *Iowa State University of Science and Technology v. United States*, 205 Ct.Cl. 339, 352, 500 F.2d 508, 516 (1974); and *see also Carolinas Farm & Power Equipment Dealers v. United States*, 699 F.2d 167, 168 (4th Cir.1983).

At first glance there would appear to be an inconsistency between the requirement of I.R.C. § 501(c)(3) that for an organization to be exempt from income tax it must be organized and operated *exclusively* for the charitable, scientific, or other exempt purpose set out in that section and § 511, which imposes the tax on the unrelated business income of the exempt organization. If it has unrelated business income, how can the organization be operated *exclusively* for the exempt non-business purpose? Is not the Commissioner required to determine that the organization is not exempt at all? *See Better Business Bureau v. United States*, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67 (1945), and *Scripture Press Foundation v. United States*, 152 Ct.Cl. 463, 285 F.2d 800 (1961), *cert. denied*, 368 U.S. 985, 82 S.Ct. 597, 7 L.Ed.2d 523 (1962).

The legislative history helps resolve the apparent inconsistency. In connection with its consideration of the Revenue Act of 1950, c. 994, 64 Stat. 906, it was brought to the attention of Congress that a number of court decisions had held that the income of a variety of business corporations organized and operated for profit was exempt from tax solely because their stocks were owned by organizations which were themselves exempt from income tax and the profits of these "feeder corporations" were payable to the exempt organizations, the most notorious example being a spaghetti factory the profits of which inured to New York University. H.R.Rep. 2319, 81st Cong.2d Sess., 41, 124, 1950–2 C.B. 469, citing *C.F. Mueller Co. v. Commissioner*, 14 T.C. 922 (1950), *rev'd*, 190 F.2d 120 (3d Cir.1951); *Roche's Beach, Inc. v. Commissioner*, 96 F.2d 776 (2d Cir.1938); *Universal Oil Products Co. v. Campbell*, 181 F.2d 451 (7th Cir.), *cert. denied*, 340 U.S. 850, 71 S.Ct. 78, 95 L.Ed. 623 (1950); and *Willingham v. Home Oil Mill*, 181 F.2d 9 (5th Cir.), *cert. denied*, 340 U.S. 852, 71 S.Ct. 80, 95 L.Ed. 624 (1950). And *see also Midwest Research Institute v. United States*, 554 F.Supp. 1379, 1381–82 (W.D.Mo.1983), *aff'd per curiam*, 744 F.2d 635 (8th Cir.1984). The drafters of the legislation were concerned with the competitive advantage enjoyed by these tax exempt "feeder corporations" in the conduct of their business activities and considered this advantage to be inequitable when such activities by the subsidiary corporations were not related to the

parent organizations' exempt purposes. Hearings before the House Ways and Means Committee, 81st Cong., 2d Sess., 4, 19 (1950) (statements of President Truman and Treasury Secretary Snyder); 96 Cong. Rec. 9364–65 (remarks of Representatives Simpson and Lynch); and *see also Midwest Research Institute, supra,* at 1381–82. To eliminate this abuse Congress enacted the predecessor of 1954 I.R.C. § 502,[1] which provides that "An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under section 501 on the ground that all of its profits are payable to one or more organizations exempt under section 501 from taxation."

■ The tax on unrelated business income of an exempt organization appears to have been the outgrowth of an assumption by the same committees (without citing any court decisions) that the exempt organization could engage in the same abuse by operating an unrelated business itself to feed income to the accomplishment of its exempt purpose without forfeiting its exemption. Both the House and Senate committees explained the reason for the enactment of the tax as follows:

Some of the witnesses who appeared before your committee took the position that this unrelated business income should be taxed only if received by a subsidiary organization. However, it is difficult to see why a difference in tax treatment should be allowed merely because in one case the income is earned directly by an educational or charitable organization, while in the other it is earned by a subsidiary of such an organization. In both cases the income is derived from the same type of activities and disposed of in the same manner. Moreover, in most cases the business functions now carried on by subsidiaries could be transferred to the parent if the tax were applied only to the income of the subsidiaries.

H.R.Rep. No. 2319, 81st Cong., 2d Sess. 37; 1950–2 C.B. 409; S.Rep. No. 2375, 81st Cong., 2d Sess. 29; 1950–2 C.B. 505.

Thus, the apparent inconsistency between §§ 501(c)(3) and 511 must be resolved as follows:

(1) For any of its income to be exempt, an organization must still be organized and operated *exclusively* for a purpose set out in § 501(c)(3).

■ (2) The operation of an unrelated trade or business having the purpose of earning income for use in promoting the exempt purpose, need not be deemed to change the exclusive purpose of an exempt organization, but such income is taxable as unrelated business income under § 511.

(3) If the exemption under § 501(c)(3) is conceded, then the decisive question is whether or not the challenged income is from trade or business substantially related to the carrying out of the exempt purpose and not whether it would serve an exempt purpose on its own.

Treasury Regulation § 1.513–1(a)(2) defines the term "substantially related" in I.R.C. § 513 as follows:

(2) *Type of relationship required.* Trade or business is "related" to exempt purposes, in the relevant sense, only where the conduct of the business activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is "substantially related," for purposes of section 513, only if the causal relationship is a substantial one. Thus, for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, the production or distribution of the goods or the performance of the services from which the gross income is derived must contribute importantly to the accomplishment of those purposes. * * *

■ Thus, if this regulation is valid (and neither party contends to the contrary), the

---

1. 1939 I.R.C. § 101, as amended by Revenue Act of 1950, ch. 994, § 301(a), 64 Stat. 906, 947.

conduct of the business activities which give rise to the challenged income must have a substantial "causal relationship" to the achievement of the exempt purpose, and the activities "must contribute importantly" to the accomplishment of the exempt purposes.

## III

### A.

The undisputed evidence is that plaintiff's exempt purpose is and has been since its inception to provide multi-disciplinary scientific research for government and industry; that no income therefrom inured to any individual; that plaintiff received rulings from the I.R.S. that its income from such activities are exempt; that the nature of plaintiff's business has not changed in any way since it received its exemption; that the Service has never sought to revoke such rulings, and defendant does not contest plaintiff's exemption in this litigation. Under these circumstances, it is difficult to comprehend why the performance of some portion of such activities has no causal relationship and does not contribute as importantly to the accomplishment of plaintiff's exempt purpose as any other portion of its activities.

Defendant's contention that 11 of the 24 challenged projects were not scientific in nature has no support in the record.

The terms "science" and "scientific" are not defined in the Internal Revenue Code, Congress apparently having chosen to rely on the commonly understood meaning of the term. The *McGraw-Hill Dictionary of Scientific and Technical Terms*, (Lapedes ed., 2d ed. 1978), p. 1414, defines "science" as a "branch of study in which facts are observed, classified, and, usually, quantitative laws are formulated and verified; [or] involves the application of mathematical reasoning and data analysis to natural phenomenon." The *Random House Dictionary Of The English Language*, p. 1279 (Stein ed. 1967), defines "science" as "[k]nowledge, as of facts and principles, gained by systemic study." Thus, in the

context of this litigation, "science" will be defined as the process by which knowledge is systematized or classified through the use of observation, experimentation, or reasoning. *See also Midwest Research Institute v. United States*, 554 F.Supp. 1379, 1385–86 (W.D.Mo.1983), *aff'd* 744 F.2d 635 (8th Cir.1984); *Oglesby v. Chandler*, 37 Ariz. 1, 288 P. 1034, 1038 (1930); *In Re Massachusetts General Hospital*, 95 F. 973, 976 (C.C.Mass.1899). This definition is in accord with the view of the court in *Midwest Research Institute*, 554 F.Supp. at 1386, that—

> while projects may vary in terms of degree of sophistication, if professional skill is involved in the design and supervision of a project intended to solve a problem through the search for a demonstrable truth, the project would appear to be scientific research.

The regulations under § 501(c)(3) also add meaning to the terms "scientific" and "scientific research" in the context of that statute, which neither party disputes, to wit Treas.Reg. § 1.501(c)(3)–1(d)(5):

> (i) * * * For research to be "scientific", within the meaning of section 501(c)(3), it must be carried on in furtherance of a "scientific" purpose. The determination as to whether such research is "scientific" does not depend on whether such research is classified as "fundamental" or "basic" as contrasted with "applied" or "practical".
>
> * * * * * *
>
> (ii) Scientific research does not include activities of a type ordinarily carried on as incident to commercial or industrial operations, as, for example, the ordinary testing or inspection of materials or products or the designing or constructing of equipment, buildings, etc. * * *

Under any of these definitions, all 24 challenged contracts may properly be deemed scientific research, as they meet these criteria. The government has stipulated that virtually all of IITRI's contracts consisted of work performed by, and capable of being performed only by, qualified engineers and scientists with expertise in

particular technological fields. Further, all of plaintiff's expert scientific witnesses testified that there were no significant differences between the 24 contracts the government is challenging and the 34 contracts not being challenged, with respect to their nature, content, sophistication of the scientific research involved, or the scientific methodology or approach. This testimony was not disputed in any way by the government.

■ The testimony further indicated that IITRI was not involved in the commercialization of the products or processes developed as a result of its research. IITRI would only develop a project to the point where the research principles were established. At this point, the sponsors would make the principles available to different customers, usually in the form of newly developed products or equipment. Also, the evidence showed that IITRI did not conduct consumer or market research, social science research, or ordinary testing of the type which is carried on incident to commercial operations. IITRI's activities, therefore, cannot be said to run afoul of the "commercial operations" section of Treas.Reg. § 1.501(c)(3)–1(d)(5)(ii). The fact that research is directed towards solving a particular industrial problem does not necessarily indicate that the research is not scientific. *See* Treas.Reg. § 1.501(c)(3)–1(d)(5)(i) (1976) ("The determination as to whether such research is 'scientific' does not depend on whether such research is classified as 'fundamental' or 'basic' as contrasted with 'applied' or 'practical'.")

■ The scientific nature of each of the 11 contracts challenged by the government as not scientific can be readily understood from a brief description thereof. Any of these contracts can be deemed to be scientific research because it either: 1) involved the use of observation or experimentation to formulate or verify facts or natural laws; 2) could only have been performed by an individual with advanced scientific or technical expertise; 3) added to knowledge within a particular scientific field; 4) involved the application of mathematical rea-

soning; and/or, 5) was an attempt to systematize or classify a body of scientific knowledge by collecting information and presenting it in a useful form.

(1) *C6333:* Water Quenching of Coke. This contract, sponsored by the U.S. Environmental Protection Agency, assessed the impact of clean and contaminated water quenching of coke by the steel industry on the total suspended particulate levels in and around coke plants. The contract was for research and development work to solve some of the pollution problems of the steel industry. For this contract, IITRI's task was to develop an analytical model to predict the ambient air quality impact of quench tower emissions. In substance, this was a mathematical model designed to predict particulate levels suspended in the air downstream as a result of using water in water scrubbing towers to quench air pollution and gases from coking operations.

The defendant contends that this project was taxable because IITRI simply co-ordinated the work of others on behalf of the Environmental Protection Agency. There is no evidence in the record to support this contention. Further the evidence indicated both that this project was substantially related to other scientific projects performed by IITRI relating to causes of environmental particulates, and not challenged by the I.R.S., such as a study of the effect of rocket exhaust particulates on citrus crops, and also that this project involved the development of a mathematical model by IITRI which is included within the ambit of "science."

(2) *C9965:* Spacecraft Thermal Control Coatings. This contract was designed to develop space stable improved low solar absorbent spacecraft surface coatings for the National Aeronautics and Space Administration (NASA). It was one of a series of like government contracts extending over a period of 11 years. Every earth satellite or spacecraft needs an outer coating to reflect solar rays in the absence of atmospheric dilution, so as to enable the craft to maintain viable temperature control. Most white coatings under the action of such

extreme sun rays will turn yellow or more deeply colored, and the deeper the color the more heat it will absorb. IITRI has continued to develop new paints to accommodate the expanding frontier of space research for which present paints are not suitable. The research and development of this paint was done by IITRI's polymer chemists.

Defendant asserts that this was "simply a contract to sell paint for spacecraft." But the direct evidence of plaintiff's chemical division research director is to the contrary, and the government introduced no evidence inconsistent therewith. The only reason IITRI manufactured the paint for NASA after it had developed it was that commercial paint companies declined to produce this paint because it was needed only in small amounts, the process for making it was very expensive, and the paint would have to be made by a research staff and not by paint technicians.

(3) *C6360:* Study of Gaseous Emissions as Environmental Pollutants. This contract was sponsored by the Holston Defense Corporation for which IITRI was a subcontractor on government contract No. DAA09–73–0079. The sponsor operated a munitions manufacturing plant, owned, funded and operated by the United States government. The sponsor had installed a scrubber known as a molecular sieve system to control $NO_x$ emissions (chemical compounds containing only nitrogen and oxygen), especially NO and $NO_2$. To determine the efficiency of the molecular sieve, IITRI was requested to collect effluent gases discharged by the plant over a 5 to 7 month period and report monthly on the $NO_x$ concentrations found. The study involved the collection, analysis, and characterization of gaseous emissions which were known to be environmental pollutants. IITRI was selected to perform the work because of its expertise in enviromentally harmful gaseous and particulate emissions and its previous experience working in munitions plants. This contract was part of the overall air pollution research done by IITRI, which relates to gases and particulates.

Defendant asserts that the project was the type of research which was carried on as incident to commercial operations and also the work could have been performed by a commercial testing service. Defendant has admitted that this contract was a part of IITRI's research relating to the control of environmentally harmful gases and particulate emissions; and it offered no expert testimony which could support the proposition that the collection, analysis, and characterization of effluent gases is not scientific research. Under Treas.Reg. § 1.501(c)(3)–1(d)(5)(i) a contract can be deemed to be scientific even where it involves applied scientific research. Therefore, this contract falls within that part of the definition of "science" which applies to activities which involve the use of observation or experimentation to formulate or verify facts or natural laws.

(4) *B6138:* Near Net Shape Metallurgy. This contract was performed for the U.S. Air Force Material Laboratory. IITRI was to investigate near net shape metalworking processes and metal projects designed to advance the utilization of novel manufacturing technology, to organize a symposium in near net shape metalworking and to publish the proceedings. Near net shape metalworking is a process designed to cast a part very near to its final shape so as to economize on both material and final machining. One process within the general field of near net shape metalworking is the squeeze casting process involved in contract B8179. Until the record from the symposium proceedings was published, there was no current source of information concerning near net shape metalworking.

■ Defendant contends that this "was no more than a routine survey and compilation of existing information" and, therefore, not scientific research. Included within the definition of "science", however, are activities which classify or organize a body of scientific knowledge. There was no evidence to support the contention that this project did not organize information in the field of near net shape metalworking. Also, this project furthered research in

near net shape metalworking because it provided a current source of information in this scientific field. Finally, the dissemination of scientific information is within the scope of IITRI's exempt function.

(5) *D9683:* Symposium on Jet Cutting Technology. This contract was not included in the Notice of Deficiency in this case and the government has neither mentioned this contract in its brief nor presented any argument as to why it is not substantially related to IITRI's exempt activity. Under this contract, IITRI organized an international symposium on high pressure water jet cutting technology at which IITRI personnel delivered papers and presentations. At this time, IITRI was the leader in development and research of the technology. The sponsor of this contract desired to be kept up-to-date on current developments in this field of technology. This contract is scientific research for reasons similar to those set forth in the discussion of contract B6138.

(6) *H6039:* Research and Engineering for Automation and Productivity in Shipbuilding. Defendant contends that this project is taxable because it involved only the collection and presentation of reports on the research of others. This contention is not supported by the record.

The contract, sponsored by the Maritime Administration of the U.S. Department of Commerce, was part of the government's program to assist the U.S. shipbuilding industry in improving its productivity and competitiveness. The participants in the program included the Maritime Administration, IITRI, participating U.S. shipyards, manufacturers of ship components, and other research institutes. One purpose of the program was to disseminate information concerning shipbuilding technology, and, where necessary, to develop new technology and productivity methods. This program began in 1973 when the Maritime Academy acquired the AUTOKON–71 computer program, which was a software program developed in Norway to aid in computer assisted design and construction of ship hulls. IITRI modified the program to

meet U.S. needs. It adapted it to U.S. computers and changed its standards to those required in the U.S. shipbuilding industry; it made various technical contributions to research and development, including improvements in welding technology; and it conducted symposia and published papers to disseminate to the industry the results of its research and technological developments. These changes took 2 or 3 years to complete.

This project can be included within the definition of scientific research because IITRI was involved in adapting the AUTO-KON–71 program to the United States shipbuilding industry. The government neither asserted that computer programming is not scientific nor introduced expert testimony to prove that the adaptation of a computer program is not scientific in nature. Computer programming falls within the definition of science because it is a branch of mathematics.

(7) *H6042:* CAD/CAM Reference Manual. This contract, sponsored by the National Science Foundation, was for the preparation of a CAD/CAM (computer aided design/computer aided manufacturing) reference manual. Its purpose was to identify current CAD/CAM and related sociotechnical research and researchers in product design and manufacturing, to develop an organizational structure for the collateral data in order to clarify the direction of the CAD/CAM development effort, to encourage the interchange of technical information among field practitioners, and to isolate potential knowledge gaps. IITRI's work culminated in a widely disseminated and used research manual. The manual listed all research being done in the CAD/CAM field. IITRI was chosen for this project because it had the best "connections" in this particular scientific field; i.e., its personnel knew who was working on what project worldwide, where to look for published information and whom to ask for further information.

■ Defendant contends that the contract was taxable because "[t]he end product was essentially no more than a tele-

phone book yellow pages." Defendant does not, however, make any argument as to why such a compilation did not advance IITRI's scientific purposes. The record indicates that this project significantly advanced IITRI's scientific purpose, since it gave researchers in this field the ability to easily make contact with other researchers in the CAD/CAM field when working on other projects. It is also scientific in nature for reasons similar to those outlined in regard to contract B6138.

(8) and (9) *H6041* and *H6044:* Contract H6041, sponsored by the Board of Education of the City of Chicago, was for "A Proposed Longitudinal Analysis of Data from State-Supported Bilingual Education Programs." IITRI undertook to develop statistical methods to analyze student performance data in order to evaluate the effectiveness of Chicago's bilingual education programs, to develop a statistical model to predict the future performance of students based on specific tests and to determine which tests are the best predictors of school performance. Contract H6044, also performed for the Chicago Board of Education, was for a Method of Statistical Analysis of School Programs for the Disadvantaged. It involved the development of statistical methods for analysis of the 24 activities used by the City to augment its services for educationally disadvantaged students residing in high poverty areas, and the effect of individual variables on such methods. Both of these projects involved very sophisticated analysis techniques which had to be developed out of statistics and operations research, both of which are branches of mathematics. The mathematical disciplines involved in this research are recognized by universities which have established departments in these areas and also by the publishers of technical journals. These contracts essentially involved the application of mathematical models to social science data.

Defendant contends the proceeds from both contracts are taxable because the contracts only required IITRI to gather information and use existing computer programs to analyze this data. This assertion is not supported by the record. As indicated above, these contracts required IITRI to apply advanced mathematical methods of analysis to social science data. The record also reveals that the relevant scientific data was collected by the school board and not by IITRI. Both the plaintiff's witnesses and the authorities previously cited include the development of mathematical tools for application to other fields of research as within the definition of science, while the government offered no expert testimony to support the proposition that mathematical research is not included within the concept of science.

(10) *H6046:* NASA Technology Transfer. This contract, sponsored by NASA, was entitled "Market Analysis of Candidate Applications Engineering Project." Its purpose was to assist the agency in the transfer of technology developed in space programs to U.S. industry for commercial development and utilization. IITRI was asked to do market analysis studies because NASA did not possess sufficient technical expertise to evaluate the technological and economic feasibility of a transfer of the particular NASA developed technology to U.S. industry. This study analyzed both the technical aspects of the NASA technology as well as the economic feasibility of its transfer to industry. Essentially, IITRI was to sift through all of NASA's research and determine which ideas were potentially useful to particular segments of industry. NASA selected IITRI for this project because of its reputation in this scientific area (*e.g.* metallurgy and mathematics). This scientific expertise was used to separate the wheat from the chaff. Defendant asserted that this contract was taxable because it was market research and not scientific research. However, this contract can be deemed to be scientific because it could not have been performed by personnel lacking in scientific expertise.

(11) *E6364:* Aircraft Vortex Studies. Defendant contends that this research project did not constitute scientific research because IITRI only supplied replacement

parts and personnel to operate a vortex data acquisition facility. This contention is not supported by the record.

This contract was sponsored by the U.S. Department of Transportation and was an extension of contract E6343, which has been conceded by the government to be non-taxable. These two contracts required IITRI to design, build, test, install and maintain a Mobile Vortex Data Acquisition Facility at O'Hare Airport in Chicago. Trailing vortices from heavy jet aircraft represent a severe hazard to following aircraft. In order to maintain a high level of safety, large aircraft separations must be maintained, which reduces runway operations and airport capacity. This program was designed to alleviate the vortex hazard by the acquisition of vortex behavior data under certain meteorological conditions, to develop vortex models and vortex behavior prediction techniques, to test a Vortex Advisory System and to culminate in the design of Wake Vortex Avoidance Systems for ultimate implementation at major airports generally. Also pursuant to its three vortex contracts, IITRI prepared and published a Vortex Data Acquisition System Operation Manual.

As an extension of E6343, conceded by the government to be non-taxable, this contract is substantially related to IITRI's scientific research on airplane vortices. Defendant offered no evidence to refute the statement by plaintiff's expert witness that the development of both vortex models and vortex behavior prediction techniques involved scientific research.

### B.

The government challenges the remaining 13 of the 24 disputed contracts on the ground that the scientific purposes allowed for exemption by § 501(c)(3) require that the research be done in the public interest, and that because the specific results of the 13 projects were not published such activities were not scientific research in the public interest. In support of this contention, defendant relies on those portions of Treas. Reg. § 1.501(c)(3)–1(2)(5) which read as follows:

(5) Scientific defined.—(i) Since an organization may meet the requirements of section 501(c)(3) only if it serves a public rather than a private interest, a "scientific" organization must be organized and operated in the public interest (see subparagraph 1(ii) of this paragraph). Therefore, the term "scientific", as used in section 501(c)(3), includes the carrying on of scientific research in the public interest. * * *

\*　　\*　　\*　　\*　　\*　　\*

(iii) Scientific research will be regarded as carried on in the public interest—

(a) If the results of such research (including any patents, copyrights, processes, or formulae resulting from such research) are made available to the public on a nondiscriminatory basis;

(b) If such research is performed for the United States, or any of its agencies or instrumentalities, or for a State or political subdivision thereof; or

(c) If such research is directed toward benefiting the public. The following are examples of scientific research which will be considered as directed toward benefiting the public, and, therefore, which will be regarded as carried on in the public interest: (1) Scientific research carried on for the purpose of aiding in the scientific education of college or university students; (2) scientific research carried on for the purpose of obtaining scientific information, which is published in a treatise, thesis, trade publication, or in any other form that is available to the interested public; (3) scientific research carried on for the purpose of discovering a cure for a disease; or (4) scientific research carried on for the purpose of aiding a community or geographical area by attracting new industry to the community or area or by encouraging the development of, or retention of, an industry in the community or area. Scientific research described in this subdivision (c) will be regarded as carried on in the public interest even though such re-

search is performed pursuant to a contract or agreement under which the sponsor or sponsors of the research have the right to obtain ownership or control of any patents, copyrights, processes, or formulae resulting from such research.

■ Plaintiff responds that the special definition of "scientific" promulgated by the regulations for qualification for exemption under § 501(c)(3) is irrelevant to whether, pursuant to §§ 511–513, the challenged sources of income are unrelated to the accomplishment of plaintiff's exempt purpose. It may be true that the operation of a cafeteria to serve plaintiff's staff would not be unrelated to the accomplishment of plaintiff's scientific purposes, even if the cafeteria were not run scientifically in any sense of the word. But since plaintiff argues that the challenged projects are related because each project is similar to the others and therefore its performance causes or contributes importantly to the accomplishment of plaintiff's exempt purpose of offering multidisciplined scientific research to the government and industry, the qualification of each project to accomplish the exempt purpose remains relevant.

■ However, the government challenge to the 13 contracts must be rejected for other reasons. First, Treas.Reg. § 1.501(c)(3)–1(d)(5) does not require publication in every instance. It merely prescribes that for an organization to be entitled to exemption as one organized and operated exclusively for scientific purposes it must serve a public rather than a merely private interest. It deems scientific research to be carried on in the public interest—(a) If the results of such research are made available to the public on a nondiscriminatory basis; (b) If such research is performed for the United States or for a State or political subdivision thereof; (c) If the research is directed toward benefiting the public, examples of which include aiding in the education of students, by publication in any form available to the interested public, seeking a cure for a disease, aiding a community or geographical area to add, retain or develop new industry in the area.

It is apparent that publication of the results is not the only means by which scientific research can be in the public interest. Indeed, the same regulation also states that scientific research will be regarded as carried on in the public interest even though it is performed pursuant to a contract under which the "sponsors of the research have the right to obtain ownership or control of any patents, copyrights, processes, or formulae resulting from such research." The provision allowing retention of ownership of non-patented processes or formulae necessarily implies that research may be in the public interest even if the results are kept secret.

Second, Rev.Rul. 76–296, 1976–2 C.B. 142, upon which the government relies to support its contention, provides that scientific research will be considered "in the public interest" if substantially all of the information *which would be useful to the interested public* is published.

■ At most, the record indicates that IITRI's sponsors may prevent the publication of proprietary information involved in the projects the sponsors finance, but in fact object to such publication only infrequently and for short periods of time. Indeed, this type of arrangement is permissible under Treas.Reg. § 1.501(c)(3)–1(d)(5)(iii)(c)(4).

Plaintiff's evidence is that for the scientists at IITRI publication is "a way of life." IITRI has a policy of encouraging its scientists and engineers to publish and present papers reflecting the work they have done. The record indicates that IITRI personnel publish approximately 1,000 papers per year. A scientist at IITRI will ordinarily publish the generalized results of a number of projects within a specific scientific discipline. In practice, substantially all of the information derived from scientific research is published or made available to the public through presentations at research conferences and symposia. On the other hand the government introduced *no* evidence to show that IITRI has not published substantially all of the information in

which the public would be interested with regard to *any* of the challenged contracts.

 Third, defendant's insistence that plaintiff document each publication related to a particular challenged contract is rejected, because the government did not raise prompt publication of the results of each contract as a requirement for tax-exemption until it filed its post-trial brief in this case. At trial, in response to defendant's questioning, plaintiff's witnesses testified that they could have provided such documentation had they been given sufficient time to prepare it. Therefore, even if such a requirement existed, any failure of plaintiff to meet it would be waived as a result of defendant's failure to comply with the requirement of RUSCC 16 that a party identify prior to trial issues of fact or law which it believes are in dispute.

The contracts challenged by the government as not being "in the public interest" due to a lack of publication are summarized as follows:

(1) *C8291.* Development of Shattered Coal Product. This project was sponsored by CNG Research Company. The goal of the contract was to arrive at a method of very finely dividing coal, thereby reducing its sulphur content and providing a cleaner fuel for use in the generation of electricity. During the course of this research, IITRI developed a process whereby powdered coal was mixed with water and subjected to high pressure and temperature conditions to raise the temperature of the mixture to a level above the critical point of water. The pressure on the mixture was then suddenly released, with the result that the coal particles were shattered to $\frac{1}{1000}$ of their original size and the sulphur separated therefrom so that it could react separately to water. This new process will allow electric utilities to combat the air pollution and acid rain problem caused by the burning of coal with sulphur content, at a lower cost than the current effluent treatment methods. The sponsor brought this project to IITRI because of the Institute's previous work in environmental and fine particle research. Although plaintiff did not pub-

lish any separate papers on this particular work, it did publish papers on fine particles. In addition, it published papers incident to the issuance of at least eight patents, relating to both the process used and the equipment developed to perform the process.

(2) *C8279:* Adhesive and Binding Qualities of Corn Starch. This was an industrial contract for a corn processing company, designed to study the reaction of polymers (long chain molecules) with cornstarch. The purpose was to investigate and develop improved adhesive and binding qualities of cornstarch, so that it could be used more effectively as a paper coating. The goal was accomplished by reacting ethylene oxide with cornstarch. The information gained from this study provided the foundation for further projects on the development of cornstarch with improved binding and adhesive qualities. Although it has not issued any publications on this particular project, it was one of many projects in the carbohydrate area on which plaintiff has presented many papers.

(3) *C9985:* High Intensity Odor Control System. This contract, sponsored by the Fats and Proteins Research Foundation, involved an evaluation of a high-intensity odor control scrubbing system. The goals of the study were to operate the scrubber at optimum conditions for odor removal and to monitor the cooking operation of a rendering plant in order to correlate plant conditions and scrubber performance. This required that IITRI first identify odors it wanted to remove from the plant emissions, then devise a scrubber to remove the offending gas, and finally, test the new scrubber at the plant. This specific contract was the final phase of the process which involved evaluating the scrubber at the plant. There are very few organizations in this country which can do the odor testing required for this phase of the project. The testing at the plant was done with a Dynamic Forced Choice Triangle Olfactometer which was developed by IITRI. IITRI is a leader in developing odor research, by which it hopes to confirm the

hypothesis that there is an odor spectrum similar to the electromagnetic spectrum (visible light spectrum). It runs an international odor scientist symposium every year and has presented hundreds of papers in the area.

(4) *C8280:* Chemical Conversion Using Photochemical Reactor. This study, sponsored by the Olin Corporation, was designed to see if IITRI could take orthochlorotoluene and convert it chemically into parachlorobenzotrifluorine. Such conversion had never been accomplished before. This contract resulted in the development of a new analytical method based on gas chromatography which had never been applied previously to orthochlorobenzotrichloride. Although IITRI did not publish how it made the material it used for the analysis because that was proprietary information of the client, it did publish the analytical technique within a year after completion of the project.

(5) *C8288:* Dewatering by Pressurized Air. This project was sponsored by the Boxboard Research and Development Association, a trade association of persons in the boxboard industry. The purpose of this contract was to continue earlier work in mechanically removing water from paperboard with pressurized air through additional laboratory measurements, cost calculations, and conceptual design studies. Both this contract and contract C8290 were part of a succession of projects at IITRI for the Boxboard Research and Development Association designed to improve paper making technology by finding better ways to remove water from wood pulp. The trade association disseminated the results of IITRI's research to all of its members by having IITRI representatives give talks on its work at industry meetings and by publication of its papers.

(6) *C8290:* Mathematical Model for Water Removal. This contract, also sponsored by the Boxboard Research and Development Association, involved mathematical prediction of water removal from paperboard under a variety of conditions in wet pressing operations. A paper press, which

is two rollers between which wet nap pulp is placed, squeezes the water out of the pulp to create paper. This study was designed to express the relationship between certain variables present in paper making in terms of a mathematical equation. This formulation required consideration of 15 important variables. To develop the equation, it was necessary to winnow out those effects considered least important, and include only those effects deemed most important. As a result of this research, the conditions of pressing needed to achieve a desired goal could be determined. The development of a predictive model based on mathematical equations was considered a major break-through in pressing theory. The results of such research and that in connection with C8288 were published and disseminated throughout the papermaking industry.

(7) *B8179:* Squeeze Casting. Pursuant to this contract, sponsored by the Dana Corporation, IITRI developed a squeeze casting process that could form a heavy duty piston and optimize the parameters (*e.g.* the die and molten metal temperatures, the pressure applied and duration of application, and the time delay before the application of pressure) of the squeeze casting process developed. Squeeze casting, or liquid metal forging, is a manufacturing process which combines features of both conventional casting (a manufacturing method using molten metals) and forging (a manufacturing method altering shapes by applied pressure) techniques using super alloy dies. In squeeze casting, a liquid molten metal alloy is poured into a die cavity and there the process is timed so that just as the material starts to solidify the top portion of the die is closed and the material is squeezed into the finished shaft. The specific goal of this project was to determine the feasibility of developing a squeeze casting manufacturing process for a heavy duty aluminum alloy piston with a nickel-resist insert. To accomplish this goal, IITRI designed the squeeze casting and dies, conducted tests to determine the optimal parameters of the process, and evaluated the properties of the piston to

determine whether a feasible squeeze casting manufacturing method could be developed. IITRI obtained this project because Dana Corporation had read some of IITRI's many publications about squeeze casting and wished to ascertain whether or not it could be applied to form a heavy duty aluminum alloy pistons. IITRI published papers on this project among the many it has disseminated on squeeze casting generally.

(8) *B8180:* Corrosion Resistance of Metals. This contract was sponsored by the American Gas Association and the U.S. Department of Energy. It required IITRI to explore the reaction of metals to the internal corrosive environment of an offshore steel pipeline. For several years prior to 1976 IITRI had been conducting corrosion and materials evaluation studies under various gaseous and other hostile conditions. The work on this contract resulted in significant technical and scientific developments, including the formulation of predictive equations to relate the environmental and operational conditions of offshore pipelines to the measurements of actual internal corrosion, as well as a paper on the reliability of sensing probes attached to the steel pipelines to determine such corrosion. This project was similar to work done by IITRI in another project, contract B6131, which researched coal gasification corrosion, and was one of the 58 representative contracts which the defendant did not challenge as unrelated. Plaintiff has published many papers on corrosion problems generally which include the learning derived from all its projects in the field.

(9) *D8065:* High Pressure Water Jets. The goal of this contract was to develop an optimum high pressure water jet system for use as part of a longwall coal mining machine under the sponsorship of a West German company. Beginning in 1968, IITRI has conducted theoretical research on the effect of highly pressurized water jets (from 15,000 to 100,000 pounds per square inch) for rock, concrete, coal, steel and other material fracturing and cutting, and it has published numerous papers thereon, much of it under Federal grants. The spe-

cific project was to build a high pressure water jet machine which would work in a coal mine with reduced hazardous coal dust. Research was necessary to build this machine because it had to be adapted to the type of rock and the quantity of coal being cut and the rate at which the water would cut these materials. The IITRI scientist who worked on this project also presented and published papers on it subsequently.

(10) *D8070:* Experiments in Piston Stress. The goal of this project was to determine experimentally the state of stress in hydraulic cylinder pistons with threaded piston rods. In this scientific field, there was a large discrepancy between theory and experiment, and it was not possible to generalize on the basis of one experiment and obtain general empirical formulae. The objective of the project was to develop a finite element computer program to predict piston stresses and thereby attempt to formulate new designs of the pistons to correct the piston failures experienced in the existing design. The staff member most responsible for this project published at least 100 papers on stress analyses, including four in 1976.

(11) *E8109:* Remote Meter Reading System. This contract was a continuation of a program begun in 1967 for the Northern Illinois Gas Company to determine if a cost effective substitute for the conventional utility meter reader could be developed. Essentially, IITRI was hired to invent a low cost long-lived battery energized radio device for installation in a consumer's home, which would respond to a vehicle going up and down the street and would give an accurate and reliable meter reading, and thereby reduce labor costs. For that period, this work involved some of the most challenging technological questions. During the taxable year at issue IITRI made several design innovations in the transponder receiver and transmitter which reduced their size in unit costs. IITRI also did neighborhood signal propagation studies to determine the effects of chain link fencing, parked automobiles, aluminum siding, and below grade installation on trans-

mission path loss. IITRI developed a programmable fading simulator to aid in laboratory investigation of path loss variations on transponder performance. The results of these tests led to several receiver circuit changes which extended the operating range of the prototype system. IITRI staff members have published many papers and conducted symposia with respect to specializer circuitry, of which this project was only a small part.

(12) *J8213:* Industrial Crane Safety. This contract, entitled "Structural Evaluation of Power Cranes", was sponsored by the Manitowoc Crane Company. Its purpose was the development of analytical tools and models which could be used to analyze the material and structural aspects of large industrial cranes, so as to enable the sponsor to redesign and manufacture industrial cranes which were safer and less likely to experience structural and material failures. IITRI utilized both structural analysis and computer aided engineering to perform this contract over a 20-year period. IITRI's analysis allowed the stresses along the laced members of a long crane boom to be accurately calculated. The substance of such research were disseminated throughout the industry and resulted not only in safer cranes but also in taller crane structures and longer crane booms. In addition, IITRI staff members published up to 10 papers on such structural analysis having to do with crane safety.

(13) *J8184:* Nuclear Plant Impact Analysis. This contract, entitled "Full Scale Evaluation of Tornado Generated Missile Impingement on Two Foot Thick Concrete Walls", was sponsored by the Stone and Webster Engineering Corporation along with eight public utilities. The purpose of the contract was to evaluate the structural dynamics between tornado-borne debris and the concrete walls enclosing a nuclear reactor. IITRI undertook an investigation of the interaction of wood (telephone or electric) poles, steel pipes, and steel slug missiles thrown by tornadoes against reinforced concrete missile barriers. (In a self-sponsored project, IITRI developed and constructed the research equipment used to propel the missiles.) After IITRI collected and analyzed this scientific data, it developed a predictive mathematical equation, determined the structural adequacy of current concrete barrier design and evaluated two alternative designs. IITRI personnel also published papers and conducted symposia with respect to the impact of tornado borne debris on walls protecting nuclear plants. The results of its research were disseminated not only to its sponsors and their industry, but also the Nuclear Regulatory Commission.

IV

In addition to the performance of scientific research for government and industry, the undisputed evidence warrants the conclusion that plaintiff also had the purpose of conducting scientific research and analysis and disseminating the results thereof. Looked at in this light, as one scientist witness expressed it, the individual contracts were "building blocks" in an evolving structure of knowledge, which enabled plaintiff to advance the scientific projects and fields of interest of the talented scientists on its staff.

Generally, each contract was part of a larger area of scientific research activity that had been and would continue to be conducted by IITRI. The Research Committee, when deciding whether or not to undertake a contract, would evaluate the nature, scope, and research content of the contract to ascertain whether these were consistent with IITRI's research objectives and capabilities. For example, IITRI's chemistry department, being interested in developing the field of odor research, by undertaking different contracts involving odors IITRI's scientists, hoped to add to their store of knowledge concerning the composition of odors and ultimately prove that there exists an odor spectrum similar to the electromagnetic spectrum. Thus, each contract in this area was designed to contribute importantly to the achievement of plaintiff's scientific purpose.

Typically, a scientist at IITRI would work on a number of projects within a particular area of science over a number of years. Within the same period of time and same area of expertise, the same personnel would conduct "in-house", and government and industrial contracts. The scientist would then be able to draw upon knowledge gained through this work and synthesize these findings into a paper or other type of presentation. The publishing of the results and theories derived from their work on specific contracts enhanced the reputation of the scientists at IITRI and that of the Institute itself within the scientific community. This scientific reputation furthered the scientific purpose of the Institute because government and industrial sponsors solicit IITRI's input in scientific matters on the basis of its reputation in specific scientific fields and opened new fields of inquiry for further research and publication.

▆▆▆▆ Indeed, the government concedes in its brief that the 24 projects it contends are taxable "may have grown out of or engendered other activities substantially related to plaintiff's exempt purpose."

Accordingly, it is held that the 24 contracts are substantially related to IITRI's exempt purpose and the income therefrom is not taxable.

### V

▆▆▆▆ In any event, the income from nine of the 24 challenged contracts is excluded from unrelated business income tax because it was derived from contracts performed by IITRI for the United States or a political subdivision of a state. Section 512(b)(7) of the Internal Revenue Code states:

There shall be excluded [from the unrelated business income tax] all income derived from research for (A) the United States or any of its agencies or instrumentalities or (B) any State or political subdivision thereof;

The legislative history of this section indicates that the term "research" in that section was intended to include not only fundamental research but also applied research such as testing and experimental construction and production. H.R.Rep. No. 2319, 81st Cong., 2d Sess. 37, 1950–2 C.B. 409; S.Rep. No. 2375, 81st Cong., 2d Sess. 30, 1950–2 C.B. 505.

The government has stipulated that all contracts in the "6000" series were contracts performed for the government. (Stip. # 13) An examination of these contracts also reveals that they were in fact scientific research performed for federal or state government agencies. (*See* discussion of individual contracts, *supra.*) Therefore, in addition to the reasons heretofore enumerated, challenged contracts numbers B6138, C6333, C6360, E6364, H6039, H6041, H6042, H6044, and H6046 are held to be not subject to the unrelated business income tax because they were performed for a state or the federal government.

### VI

Plaintiff also contends that the unrelated business tax is inapplicable to it because, even if some of its contracts did not qualify for exemption, they were not part of any separable, regularly carried on trade or business, as required by Treas.Reg. § 1.513.1(a) but were at the most sporadic activities.

Defendant, on the other hand, would lump together all contracts not qualifying for exemption and label them as a regular business carried on in addition to its exempt business. In view of the decision already arrived at, it is unnecessary to decide this question herein.

### *Conclusion*

For the above reasons, it is held that IITRI has not engaged in a trade or business substantially unrelated to its organization and operation for scientific purposes. Therefore, the Commissioner's imposition of the unrelated business income tax on certain of plaintiff's activities was erroneous, and plaintiff is entitled to a full refund

of $109,758.59 with interest as provided for by law.