T.C. Memo. 1996-34


UNITED STATES TAX COURT


OREGON STATE UNIVERSITY ALUMNI ASSOCIATION, INC.,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No 2133-94.                    Filed January 30, 1996.


    <u>Philip N. Jones</u>, <u>Carolyn W. Miller</u>, and <u>Stephen J.</u>
<u>Klarquist</u>, for petitioner.

    <u>Brenda M. Fitzgerald</u>, for respondent.


          MEMORANDUM FINDINGS OF FACT AND OPINION

    COLVIN, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income tax of $89,590 for 1990 and $120,288
for 1991.

    The issue for decision is whether petitioner's income from
an affinity credit card program is a royalty excluded by section

512(b)(2) from the tax on unrelated business income.  We hold that it is.

Section references are to the Internal Revenue Code in effect for the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.  Petitioner

Petitioner, Oregon State University Alumni Association, Inc. (OSUAA), is an Oregon nonprofit corporation exempt from Federal income tax under section 501(c)(3).  Petitioner's principal place of business is Corvallis, Oregon.  Petitioner was established to promote the interests and ideals of Oregon State University (OSU), to stimulate and encourage loyalty in its students and former students, and to develop a sense of responsibility for continued progress in OSU educational programs.  Petitioner had 12 employees in 1989-90 and 13 in 1990-91.

B.  History of the OSU Alumni Association Affinity Credit Card Program

In 1986 and 1987, petitioner's executive director, Donald Wirth (Wirth), became aware of affinity credit card programs through news articles and contacts from other organizations.  The executive director of the Alumni Association of the University of Oregon (AAUO), Philip Super (Super), told Wirth about proposals

he had received from the United States National Bank of Oregon (USNB) and another financial institution. Wirth and Super wanted their organizations to develop an affinity credit card program.

Petitioner and the AAUO formed a committee to solicit proposals from several banks and to select a plan. Petitioner and the AAUO formed the committee to increase their bargaining power and to avoid duplication of effort. The committee was headed by Wirth and Super. Its members were volunteers from both organizations. After reviewing 8 to 10 plans, the committee chose USNB's plan. After negotiations, the parties signed an Affinity Credit Card Agreement[1] (the Agreement) on June 23, 1987.

On September 30, 1987, USNB held a press conference and issued a news release announcing the affinity credit card program. One of petitioner's representatives gave a brief speech at the press conference. Petitioner did not otherwise inform the news media of the credit card program.

USNB entered into the Agreement primarily to make money. Its objectives in signing the Agreement were to gain access to petitioner's mailing list and to obtain petitioner's endorsement. USNB believed that it would be easier to market credit cards

---

[1] The Agreement was amended on Apr. 26, 1991. The parties changed the word "fees" to "royalties" in par. 4 of the Agreement. Neither party contends that the amendment affects any issue in dispute.

through an affinity credit card program than to market credit cards otherwise.

Petitioner established the affinity credit card program to keep alumni aware of their ties to OSU, to keep OSU's name before the public, to provide a low-cost credit card to alumni and other OSU supporters, and to provide revenue for its programs without placing undue demands on its staff.

C.   The Affinity Credit Card Agreement

USNB agreed to prepare and mail, at its expense, promotional materials and credit card applications to petitioner's members. USNB also agreed:  (1) To announce petitioner's activities and alumni news four times each year, at USNB's expense, on periodic statements mailed to alumni credit card holders; and (2) to place a full-page color advertisement in petitioner's publication at the standard rate at least twice annually during the term of the Agreement.

Petitioner agreed:  (1) To give USNB the names, addresses, and graduation dates of its members; (2) to license the use of its name, logo, and official seal of OSU to USNB; and (3) to inform its members of the affinity credit card program, at its expense, at least once per year.  The Agreement did not require petitioner to mail any solicitation materials to alumni. Petitioner could prepare, at its discretion, materials containing

announcements of its activities and alumni news four times annually to accompany USNB's periodic statements.

USNB agreed to pay petitioner $4 for each new account, $4.50 for renewal of a Classic Visa card, $7 for renewal of a Premier Visa card, and 1 percent of all authorized cash purchases and advances. The Agreement was for 5 years and was automatically renewable for 1-year periods unless terminated by either party.

D.   List of Alumni

USNB asked petitioner for the list of alumni about once a year. USNB was to solicit credit card applications from those members and issue a card to approved applicants.

The data base of alumni was kept on a computer owned and possessed by the Oregon State University Foundation (OSU Foundation). Petitioner forwarded USNB's request to the OSU Foundation. The OSU Foundation prepared a magnetic tape for USNB to use. Employees of the OSU Foundation spent no more than 1 hour preparing the tape. The OSU Foundation processed the information and delivered the magnetic tape to petitioner at no charge. Petitioner sent the tape to USNB. USNB returned the tape to petitioner after using it for a mailing.

The OSU Foundation was not owned or financed by petitioner. The data base was not available on the open market. Petitioner updated this list and recorded pre- and post-graduation information about each alumnus.

USNB gave petitioner a list of alumni cardholders each quarter. Petitioner's employees spent about 2 hours each quarter entering data regarding credit card holders.

E.   Postagreement Activities by USNB

1.   USNB Mailings to Petitioner's Members

USNB hired and paid an advertising agency and direct mail house to write, design, print, and mail solicitation materials to petitioner's members. These mailings cost about $1.25 per item. Petitioner gave signatures of its president to USNB to duplicate on the promotional materials. USNB placed petitioner's logo on the promotional materials in three places. An employee of petitioner spent about 1 hour reviewing the material for each mailing and occasionally suggested minor changes or made corrections. Petitioner might suggest that USNB "tone down" the pitch of the solicitation or correct the spelling of a name. Petitioner had no authority to finally approve USNB's materials.

2.   USNB's Advertising in the Oregon Stater

Petitioner's primary means of communicating with its alumni is through the Oregon Stater and mailings. During the years at issue, the Oregon Stater was mailed six times per year and had a circulation of about 85,000. USNB paid petitioner to advertise the affinity credit card program in the Oregon Stater. USNB gave petitioner a copy of each advertisement to review and approve.

It took one or two of petitioner's employees about 30 minutes to examine the advertisements.

The Oregon Stater did not generally accept paid advertising. USNB paid petitioner $3,600 for the 1989-90 school year and $3,000 for the 1990-91 school year for these advertisements. These amounts equaled petitioner's cost to publish the advertisements.

### 3. USNB's 800 Number for Affinity Credit Card Holders

All advertisements and solicitations asked the recipient to contact USNB directly. The promotional materials listed USNB's 800 number. There was one minor exception: a newspaper article[2] entitled "Alumni Association to offer credit card", written by Suzanne Downing, a columnist for the Daily Barometer (not otherwise identified in the record), stated: "For more information, contact the Alumni Association office."

### 4. Design of the Credit Cards

USNB designed the cards issued under the program. The classic VISA card had a photograph of the OSU Memorial Union Building, which is easily recognizable by OSU alumni, and the words "OREGON STATE UNIVERSITY Alumni Association". Petitioner's logo consists of a depiction of this building, petitioner's name and address, and OSU's name. Petitioner's logo is not

---

[2] The record does not state when or where this article was published.

registered.  The premier card had the same notation as the classic card but had no photograph.

    5.    <u>USNB-OSU Business School Survey of Student Banking Needs</u>

In February 1988, USNB commissioned the OSU Business School to survey students about their banking needs.  USNB gave petitioner $5,000 for the study.  The survey was conducted by OSU students under the direction of two OSU Business School professors.  Petitioner's employees acted as go-betweens for USNB and the business school.  Petitioner disbursed the grant money as needed.

F.    <u>Postagreement Activities by Petitioner</u>

    1.    <u>Petitioner's Solicitation of Alumni</u>

The OSU printing department printed and mailed solicitation materials six times from 1987 to 1991.[3]  Four of these mailings preceded the years at issue, and two were during the years at issue.  The OSU printing department:  (a) Mailed a letter petitioner wrote and materials supplied by USNB to 58,809 alumni in 1988; (b) remailed 4,234 packets to alumni who did not receive the first mailing at a time not specified in the record; (c) printed and mailed letters written by USNB to 2,293 OSU seniors in 1988, promoting the affinity card; and (d) printed and mailed

---

[3] The OSU printing department also printed a letter, written and designed by USNB, to OSU students.  The record does not indicate when this letter was printed or whether it was mailed.

a letter written by USNB to 9,212 OSU students in 1988, promoting a banking package.

Petitioner printed and mailed materials written by USNB promoting the affinity credit card twice in 1990. One mailing was to 66,432 OSU alumni and the other was to 6,955 OSU seniors.[4] Petitioner spent $19,967 to print and mail solicitation materials in 1990. USNB reimbursed petitioner for $15,761 of that cost. Petitioner spent $73 to print and mail solicitation materials in 1991. USNB did not reimburse petitioner for any of that amount.

Petitioner was not obligated by the Agreement to print and mail these materials but did so because it cost less than the direct mail house USNB hired, USNB did not have enough in-house printing and mailing capacity, and OSU's printing department was available and convenient to the parties. Both USNB and petitioner hoped to benefit from the mailings.

Petitioner hired a professional writer to write one of these letters. Petitioner used an off-campus print shop three times to help design letters. After USNB gave brochures to petitioner, the OSU printing department printed the letters, stuffed the envelopes with letters and brochures, and mailed them. Petitioner's mailings were not as sophisticated as USNB's because

---

[4] The parties stipulated that this mailing was in 1990. Petitioner states on brief that it was in 1989. Because there is nothing in the record to indicate that the stipulation is incorrect, we accept the stipulated date.

the cardholder's accounts were not preapproved, they did not contain some material recommended by professional marketers, they were not in full color, and they were of ordinary size. USNB received more positive responses from its mailings than it did from petitioner's mailings. Ninety-five percent of the cardholders became cardholders because of USNB's marketing efforts.

2. Petitioner's Occasional Assistance to Alumni

After the affinity credit card program began, petitioner occasionally received requests from alumni for credit card applications. In each case, petitioner sent a brochure to the person making the request.

Petitioner received a few complaints from alumni who had been denied a credit card. Petitioner referred those complaints to USNB and asked USNB to look into the problem. USNB decided whether to issue a credit card. On each occasion, USNB told petitioner that the alumni member was contacted and the matter handled appropriately.

Petitioner requested on behalf of certain alumni that USNB send preapproved applications, expedite applications, and establish some credit limits above the standard.

Some alumni asked Wirth about the credit card program. He mailed a cover letter and application to each of those alumni. Wirth told eight of those alumni to send the applications to him

rather than to USNB so that he could make sure that they were processed faster.  Petitioner contacted USNB to request that credit limits higher than the standard be set for certain alumni. In about 14 letters sent to individual alumni, Wirth suggested that the alumnus contact him or petitioner if the alumnus needed further assistance.

3.    Involvement of Petitioner's Executive Director in the Affinity Credit Card Program

Wirth met with USNB and a representative from the AAUO once each year to review the performance of the affinity credit card program.  These meetings lasted about 1½ to 2 hours.  Petitioner allocated 15 percent of Wirth's salary to the affinity credit card program in 1988 and 1989, and none for the years in issue. Petitioner did not allocate any of its secretary's salary to the affinity credit card program.

On January 14, 1991, Wirth encouraged each member of petitioner's board of directors to get 10 new cardholders.  Also on January 14, 1991, Wirth urged board members to look for opportunities to give out applications for the affinity credit card.

G.    Petitioner's Travel Program

Petitioner let travel agencies use its mailing list to arrange trips for alumni in 1988, 1990, and 1991.  Petitioner received a fee for each member who went on a trip.  Petitioner received $2,028 in 1988, $27,446 in 1990, and $14,105 in 1991

from the travel program. Petitioner allocated 5 percent of Wirth's salary and 50 percent of its secretary's salary to the travel program during the years at issue.

H.   Other Licensing Agreements and Proposals

Petitioner entered into an agreement with Wayneco Enterprises, Inc. (Wayneco), on August 17, 1987. Wayneco agreed to provide class rings and commemorative watches to alumni and to pay petitioner $25 for each item purchased. Petitioner made no salary allocation for this agreement.

Other organizations made proposals for similar programs to petitioner. Petitioner rejected the solicitations because they did not benefit petitioner's members or did not further petitioner's purpose.

I.   Petitioner's Income From the Affinity Credit Card Program

Petitioner grossed $254,252 for 1990 and $357,998 for 1991 from the affinity credit card program.

OPINION

A.   Taxation of Unrelated Business Income

Section 511(a)(1) imposes a tax on the unrelated business taxable income (UBTI) of certain tax-exempt organizations. Petitioner is subject to tax on its unrelated business income under section 511(a)(2)(A) because it is tax exempt under section 501(c). Income is UBTI if: (1) The income arises from a trade or business; (2) the trade or business is regularly carried on;

and (3) the trade or business is not substantially related to the organization's tax-exempt purpose.  Sec. 512(a)(1); <u>Veterans of Foreign Wars v. Commissioner</u>, 89 T.C. 7, 19-20 (1987).

B.   <u>Royalty Income</u>

Royalty income is excluded from UBTI.  Sec. 512(b)(2).  A royalty is a payment to use valuable intangible property rights. <u>Disabled Am. Veterans v. Commissioner</u>, 94 T.C. 60, 70 (1990), revd. on other grounds 942 F.2d 309 (6th Cir. 1991).  Whether income is a royalty is decided based on the facts and circumstances.  Sec. 1.512(b)-1, Income Tax Regs.

Respondent contends that USNB's payments are not royalties because:  (1) USNB did not pay petitioner to use a valuable intangible property right; (2) petitioner did not use its own mailing list; (3) the payments to petitioner were for services rendered by petitioner; and (4) the enactment of section 513(h) precludes royalty treatment.

1.   <u>Whether USNB Paid Petitioner To Use Valuable Intangible Property Rights</u>

Respondent contends that USNB did not pay petitioner to use valuable intangible property rights because USNB did not display petitioner's logo on the cards.  We disagree.

The classic VISA card bore a photograph of the Memorial Union Building and the words "OREGON STATE UNIVERSITY Alumni Association."  The premier card also had those words but had no photograph.  USNB's failure to depict the Memorial Union Building

on the premier card does not show that petitioner failed to exchange a valuable intangible right.

In the Agreement, petitioner gave USNB access to valuable intangible property rights. The Agreement gave USNB permission to use the OSU seal with petitioner's logo. Petitioner maintained all rights to the logo which it did not specifically give to USNB. USNB could not use petitioner's name or logo after the Agreement terminated. USNB's objectives in signing the Agreement were to gain access to petitioner's mailing list and to obtain petitioner's endorsement. Those are valuable intangible property rights. Sierra Club, Inc. v. Commissioner, 103 T.C. 307, 344 (1994). We find respondent's contention about how USNB designed the credit cards unconvincing. We conclude that petitioner's income from the affinity credit card program was received in exchange for the use of valuable intangible property rights.

2.  Whether Petitioner's Use of Its Mailing List Is
    Inconsistent With Royalty Treatment

Respondent contends that petitioner's income from its mailing list is not a royalty because petitioner's use of its mailing list was a trade or business.

In Disabled Am. Veterans v. United States, 227 Ct. Cl. 474, 650 F.2d 1178, 1184 (1981), the Court of Claims held that the Disabled American Veterans (DAV) conducted the trade or business of renting its mailing list. From 1974 to 1979, DAV rented

parts of its donor list 451 times. Disabled Am. Veterans v. Commissioner, 942 F.2d at 311. DAV continuously rented names on its list during the years in issue. Disabled Am. Veterans v. United States, 650 F.2d at 1184. In renting its donor list, DAV followed the usual practices of the direct mail industry. Id. DAV prepared rate cards showing the rates it charged to customers. Id. It was widely known among list brokers that DAV's mailing list was available for rental. Id. at 1185. DAV employed two full-time employees to administer its list rentals. Disabled Am. Veterans v. Commissioner, 942 F.2d at 311.

Petitioner's mailing list rental activity is unlike DAV's rental activity. Petitioner received income from the use of its mailing list only for: (a) Alumni trips in 1988, 1990, and 1991; (b) alumni class rings and commemorative watches; and (c) the affinity credit card program at issue here. Petitioner rejected other proposals to use its mailing list because those proposals did not benefit petitioner's members or further petitioner's purpose.

Unlike DAV, petitioner did not regularly rent its mailing list. Petitioner was not involved with the direct mail industry. Petitioner did not issue rate cards. Petitioner used minimal staff time to administer its list rentals. Petitioner allocated 15 percent of Wirth's salary to the affinity credit card program in 1988 and 1989, and none for the years in issue. Petitioner

did not allocate any of its secretary's salary to the affinity credit card program.[5]  Petitioner allocated 5 percent of Wirth's salary to the travel program from 1988 through 1991.  Petitioner allocated 25 percent of its secretary's salary to the travel program in 1988 and 1989 and 50 percent in 1990 and 1991.  These allocations are not comparable to the level of commitment exhibited by DAV.  We conclude that petitioner's use of its mailing list is entirely consistent with classifying the resulting income as a royalty.

3.   Whether USNB's Payments Were for Services:  Extent of Petitioner's Role

Respondent contends that USNB paid to obtain petitioner's cooperation and assistance.

a.  Petitioner's Solicitation of Its Members

Respondent contends that petitioner's solicitation of its members for the credit card program precludes royalty treatment for the resulting income because petitioner mailed some solicitation materials twice during the years at issue (1990 and 1991) and four times during prior years; hired a professional writer to write one letter; used an off-campus print shop three times; and reviewed solicitation materials prepared by USNB.

---

[5] Respondent asserts that 25 percent of petitioner's secretary's salary was allocated to the affinity credit card program.  However, respondent cites and we have found no support for this assertion in the record.

We disagree.  Petitioner's actions were de minimis and intended to bolster petitioner's relationship with OSU alumni. Petitioner agreed to inform its members of the existence of the affinity credit card program at least once per year, but was not required to mail any solicitation materials to alumni.  USNB developed all marketing materials except one letter.  Petitioner reviewed those materials, but USNB retained final decision-making authority.  Petitioner might have asked USNB to "tone down" the solicitation materials or to correct the spelling of a name. USNB agreed to prepare and mail promotional materials. Petitioner's two mailings during the years at issue (1990 and 1991) included a letter and brochure designed by USNB.  Ninety-five percent of the cardholders became cardholders due to USNB's marketing efforts.  Petitioner included information about the program in its application materials.  Petitioner apparently was using the credit card program in part to encourage alumni to join OSUAA.

In Sierra Club, Inc. v. Commissioner, 103 T.C. at 335, a provider of financial services, American Bankcard Services, Inc. (ABS), and not the Sierra Club, was responsible for developing promotional materials.  ABS submitted a proposed marketing plan which the Sierra Club reviewed.  Id. at 336.  ABS placed advertisements in the Sierra Club's magazine and paid for them on the same terms that applied to unrelated advertisers.  Id.  The

Sierra Club could pay for direct mail or other solicitations. Id. at 313. If the Sierra Club did so, any royalties payable by ABS were adjusted. Id. ABS was responsible for soliciting members. Id. at 337. ABS was obligated to develop all promotional materials. If the Sierra Club paid production and mailing costs, ABS would compensate it for those costs. Id. at 312. The agreement in Sierra Club required that the Sierra Club fully cooperate with ABS by encouraging its members to acquire and use the services. Id. at 313. Petitioner's activities are substantially similar to those of the Sierra Club. Petitioner's solicitation activities were de minimis and were intended primarily to protect petitioner's relationship with its members and to keep alumni aware of their ties to OSU.

b. Petitioner's Providing of Services To Promote the Affinity Credit Card Program

Respondent contends that petitioner's income from the credit card activity was not a royalty because petitioner referred occasional requests for credit card applications or complaints about the denial of a credit card application to USNB; told about 14 alumni to contact its offices if they needed further assistance; and requested that USNB send preapproved applications to certain alumni, expedite about eight applications, and establish some credit limits above the standard. We disagree. Petitioner's activities were de minimis and were done to protect petitioner's goodwill with its members. When petitioner asked

USNB to make exceptions for certain alumni members, petitioner was seeking to influence how USNB ran its business, not conducting its own business.

In Sierra Club, Inc. v. Commissioner, supra, ABS promised the cardholders that they would receive a rebate of the annual fee if they participated in the program for a second year. Id. at 343. ABS breached that agreement. Id. The Sierra Club helped arrange refunds to members. Id. We found that the Sierra Club's actions were done to protect its good name. Id. Similarly, petitioner was acting to preserve its good name with alumni. We hold that USNB's payments to petitioner were not compensation for services rendered and that petitioner's activities are compatible with the treatment of those payments as royalty income.

### 4. Petitioner's Financial Risks and Rewards

In deciding whether income a taxpayer receives is royalty income, we may consider the taxpayer's financial risks and rewards, including whether the taxpayer has a net profits and gross profits interest. See Sierra Club, Inc. v. Commissioner, supra at 333.

In Sierra Club, the taxpayer did not have a net profits interest in the royalty payments because its income was based on a percentage of the total charges. Id. at 333. Instead, it had a gross profits interest. A gross profits interest is the right

to share in the gross profits without bearing the risk of loss. <u>Id.</u> Gross profits are the difference between sales and the cost of goods sold. Black's Law Dictionary 703 (6th ed. 1990).

Petitioner had a gross profits interest in the credit card program, not a net profits interest. Petitioner received a fixed percentage of all of the authorized cash purchases and advances, and a fixed amount for new accounts, regardless whether USNB had losses from the affinity credit card program. Here, as in <u>Sierra Club</u>, no provision was made to periodically compute net income or loss from the credit card program. The fact that petitioner did not have a net profits interest supports petitioner's contention that its income from the program was a royalty.

In <u>Sierra Club</u>, the taxpayer paid no direct mail costs. <u>Sierra Club, Inc. v. Commissioner</u>, <u>supra</u> at 333. We said that if the taxpayer had borne some of the expenses of marketing credit cards to its members, its interest would have been less of a gross profits interest. <u>Id.</u> at 334. During the years in issue, petitioner spent a total of $20,040 and was reimbursed by USNB for $15,761. This amount is de minimis and does not affect our conclusion that petitioner did not have a net profits interest.

5. <u>Petitioner's Desire To Make Money From the Affinity Credit Card Program</u>

Respondent points out that petitioner entered into the affinity credit card agreement in part to make money. This, however, is not a basis for us to conclude that petitioner's

income from the affinity credit card program was not a royalty.
Nor does a desire to make money, standing alone, establish that
petitioner is engaged in a trade or business.  See Commissioner
v. Groetzinger, 480 U.S. 23, 35 (1987) (not every income-
producing endeavor is a trade or business); Whipple v.
Commissioner, 373 U.S. 193, 197 (1963) (the income tax law
distinguishes between a trade or business and transactions
entered into for profit but not connected with a trade or
business).  Not all activity conducted with the expectation of
gain is a trade or business for purposes of UBTI.  Disabled Am.
Veterans v. United States, 650 F.2d at 1185.  To be engaged in a
trade or business, petitioner must be involved in the activity
with continuity and regularity and the primary purpose for
engaging in the activity must be for profit.  Commissioner v.
Groetzinger, supra at 35.

> 6.    Whether the Enactment of Section 513(h) Prevents
>        Treatment of USNB's Payments to Petitioner as Royalties

Respondent argues that the enactment of section 513(h) shows
that Congress intended to treat income earned from mailing list
rentals as income from a trade or business.  Section 513(h)
exempts from tax amounts earned by certain tax-exempt
organizations from the trade or business of exchanging or renting
mailing lists to other tax-exempt organizations.[6]  Section 513(h)

---

[6] Sec. 513(h) provides:

(continued...)

is effective for exchanges and rentals of member lists after October 22, 1986.  Respondent contends that the enactment of section 513(h) implies that renting mailing lists is generally a trade or business.  As in Sierra Club, Inc. v. Commissioner, 103 T.C. 307 (1994), respondent asks us to infer from the enactment of section 513(h) that Congress generally views gross income from the licensing of mailing lists as UBTI, unless excepted by section 513(h).  We do not draw that inference.

It is at best hazardous to infer the intent of an earlier Congress from a later one.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 114 (1989); United States v. Price, 361 U.S. 304, 313 (1960).  The inference asserted by respondent is rejected in the legislative history of section 513(h).

_____

(...continued)

> (1) In general.--In the case of an organization which is described in section 501 and contributions to which are deductible under paragraph (2) or (3) of section 170(c), the term "unrelated trade or business" does not include--
>
>       *  *  *  *  *  *  *
>
> > (B) any trade or business which consists of--
> >
> > > (i) exchanging with another such organization, names and addresses of donors to (or members of) such organization, or
> > >
> > > (ii) renting such names and addresses to another such organization.

Tax Reform Act of 1986, Pub. L. 99-514, sec. 1601(a), 100 Stat. 2085, 2766.

A colloquy between Congressmen Daniel Rostenkowski (D-Ill.), Chairman of the Ways and Means Committee, and John Duncan (R-Tenn.), Ranking Republican Member of the Ways and Means Committee, occurred in the House of Representatives on the day that the conference report which included section 513(h) was passed.  Congressman Rostenkowski's comments were as follows:

> I also have discussed with Congressman Duncan the issue of whether the provision of the bill which excludes certain income from unrelated trade or business income creates any inference under present law.  We have reached a common understanding regarding the following specific issue:
>
> The question relates to section 1601 of the bill which excludes from unrelated trade or business income revenues from the use of a tax-exempt organization's mailing list by another such organization.  Section 1601 of the bill, which specifically exempts certain such revenues from the tax on unrelated business income in the future, carries no inference whatever that mailing list revenues beyond its scope or prior to its effective date should be considered taxable to an exempt organization.

132 Cong. Rec. 26208 (Sept. 25, 1986).

We conclude that section 513(h) does not apply here.  See Sierra Club, Inc. v. Commissioner, T.C. Memo. 1993-199.

7.  Whether Royalty Treatment Is Consistent With the Role of the Tax on Unrelated Business Income

The unrelated business income tax (UBIT) was enacted to prevent tax-exempt organizations from unfairly using their tax-exempt status to compete with commercial businesses.  United States v. American College of Physicians, 475 U.S. 834, 837-838 (1986).  Respondent contends that petitioner's participation in

the affinity credit card program is the type of unfair competition between tax-exempt organizations and taxable businesses that Congress intended to subject to the UBIT. We disagree. Petitioner's activity was de minimis. USNB was competing with other credit card issuers, but petitioner was not.

Respondent cites United States v. American Bar Endowment, 477 U.S. 105 (1986). In American Bar Endowment, the Supreme Court found that the taxpayer's activity created the kind of unfair competition that led to the enactment of section 512. Id. at 114. The American Bar Endowment (ABE) raised money by providing group insurance policies to its members. Id. at 107. ABE bought a group policy for its members and paid a negotiated premium to the insurance company. Id. at 107-108. If the insurance company's cost of providing insurance to the group was lower than the premium, the company refunded the excess. Id. at 108. The excess amounts were called dividends. Id. ABE required all members to agree, as a condition of participating in the group insurance program, that ABE and not the members would keep the dividends. Id. ABE told its members that the members' share of the dividends, less ABE's administrative costs, was a tax-deductible contribution from the members to ABE. Id.

ABE actively administered the group insurance program. Id. ABE's activities included choosing insurers, negotiating premium rates with insurers, compiling lists of its members, soliciting and collecting premiums from its members, sending premiums to the

insurer, keeping files on each policyholder, answering members' questions about insurance policies, and screening claims for benefits.  Id.  The Court held that ABE was engaged in a trade or business.  Id. at 114.

The Court found that this arrangement created unfair competition because ABE's members could deduct part of their premium payment as a charitable contribution.  This deduction lowered the cost of ABE's insurance to its members.  Id. at 114-115.  Nonexempt businesses would be disadvantaged if ABE were not taxed on its earnings from the insurance program because ABE would not need to be as profitable to receive the same return on its investment.  Id. at 115.

This case is not like American Bar Endowment.  ABE paid premiums to insurance carriers; petitioner did not make payments to USNB.  ABE required members to assign any amounts paid in excess of the cost of the insurance to ABE.  Petitioner imposed no similar obligation on its members.  ABE members could deduct excess payments assigned to ABE as charitable contributions.  Petitioner's members could not deduct their payments to USNB.  ABE collected premiums and screened claims for benefits.  Petitioner did not bill cardholders, collect payments, or decide who was eligible to receive a credit card.

We disagree with respondent's contention that petitioner was unfairly competing with taxed businesses.

C.    <u>Conclusion</u>

For the foregoing reasons, we hold that petitioner's income from the affinity credit card program is a royalty for purposes of section 511.

To reflect the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155</u>.